**In re RESOL MANUFACTURING COMPANY, INC., Debtor.**

**Bankruptcy No. 86 B 15704.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 29, 1990.

Karen Walin, Towbin & Zazove, Ltd., Chicago, Ill., for debtor.

Carol Connor Flowe, William G. Beyer, Deborah West, Mark Blank, Pension Benefit Guar. Corp., Office of the General Counsel, Washington, D.C., Leonard A. Grossman, Office of the Solicitor, U.S. Dept. of Labor, Chicago, Ill., for PBCG.

## MEMORANDUM OPINION SETTING FORTH THE STANDARD TO BE USED IN THE DISTRESS TERMINATION OF THE DEBTOR'S PENSION PLAN

SUSAN PIERSON DEWITT, Bankruptcy Judge.

This matter comes before the Court on the Motion of the Debtor, Resol Manufacturing Company, Inc., for Authority to Terminate Its Pension Plan ("Motion for Authority to Terminate"), the Response of the Creditor, the Pension Benefit Guaranty Corporation ("PBGC") to the Debtor's Motion for Authority to Terminate, the Memorandum of the PBGC Regarding the Debtor's Motion for Authority to Terminate, the Debtor's Response to the Memorandum of the PBGC Regarding the Debtor's Motion for Authority to Terminate, and the Reply Memorandum of the PBGC Regarding the Debtor's Motion for Authority to Terminate. Now, therefore, for the reasons set forth below, the Court finds that the proper standard for determining whether a distress termination should occur is whether the debtor will not be able to pay its debts when due and will not be able to continue in business.

### Facts

The Debtor, Resol Manufacturing Company, Inc., manufactured plastic injected molded products and assembled finished goods for original equipment manufacturers in the appliance industry and in the automotive industry. The Debtor realized annual sales of approximately $5.5 million and employed approximately one hundred employees.

In the early 1970's, the Debtor established a single employer defined benefit pension plan for its employees ("Pension Plan") which was amended from time to time to comply with the Employee Retirement Security Act of 1974 ("ERISA"), § 4001 *et seq* as amended, 29 U.S.C. § 1301 *et seq*. In 1986, the Debtor determined that it needed to terminate its Pension Plan in order to continue operating. At that time, the Debtor had not funded the Pension Plan for approximately three years, and the Pension Plan assets, valued at ap-

proximately $165,000.00, were frozen pending its termination.

On October 6, 1986, the Debtor filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. In September of 1987, the Debtor submitted its Notice of Termination and other necessary documentation to the PBGC. The documentation disclosed that the PBGC's guaranteed portion of the Pension Plan was fully funded. The Pension Plan's assets, however, were insufficient to pay all benefits due participants by approximately $65,000.

On November 12, 1987, the Debtor's Chapter 11 Plan was confirmed. The Plan provided that the Class 2(b) unsecured creditors receive a *pro rata* share of $415,000.00 payable $275,000.00 on December 31, 1988, $25,000.00 on December 31, 1989, and $115,000.00 on December 31, 1990. During 1988, however, the Debtor was unable to generate the necessary $275,000.00 to pay the unsecured creditors. Thus, the Debtor amended its Plan to pay the Class 2(b) unsecured creditors $415,000.00 as follows:

> $144,064.87 on or before February 24, 1989, $170,935.13 payable from 75% of Resol's annual net cash flow for years 1989, 1990, 1991, and 1992. Payments shall be made on December 31, 1989 and on each December 31 thereafter until Resol disburses $270,935.13 to Class 2(b) creditors. The aggregate amount of $279,935.13 shall be paid on or before December 31, 1992.

Although the Debtor knew or reasonably should have known of the existence of the PBGC's claims and of its own fiduciary duty to pursue the Pension Plan's minimum funding claims, the Debtor made no provision in its confirmed Plan for such claims.[1]

On June 6, 1988, the Debtor filed its Motion for Authority to Terminate the Pension Plan under distress circumstances.

The Debtor alleges that if the PBGC's priority and administrative claims are allowed, it will be unable to continue in business. The Debtor further contends that its business cannot generate sufficient cash to pay the PBGC's claims *or* to continue funding the Pension Plan and to pay the Class 2(b) general unsecured creditors in accordance with the Plan as modified. Thus, the Debtor argues that if the Pension Plan is not terminated, it will default under the provisions of the Plan, and the case may be converted to a Chapter 7 liquidation.

In response, the PBGC argues that the Debtor has three alternatives. First, the Debtor may continue the Pension Plan and pay for the benefits it promised over a period of time by complying with the minimum funding requirements set forth in ERISA and the Internal Revenue Code. Second, the Debtor may contribute sufficient funds to the Pension Plan to allow it to terminate in a standard termination under ERISA, or third, it may seek court approval of a distress termination of the Pension Plan under which the Debtor will immediately become liable for the full amount of the Pension Plan's unfunded benefit commitments. The Debtor has chosen the third alternative, a distress termination.

Upon presentation of the Motion for Authority to Terminate the Pension Plan, the Court ordered the parties to brief two issues; whether the Court has jurisdiction to terminate the Pension Plan; and the standard to be used in terminating the Pension Plan. The parties are in agreement that the Court has jurisdiction to terminate the Pension Plan. Accordingly, the sole issue before the Court at this time is what standard is to be applied in a distress termination of the Pension Plan.

### Analysis

Section 1341(c)(2)(B) of Title 29 provides in pertinent part[2]:

---

1. On February 18, 1988 the PBGC filed estimated proofs of claim aggregating $301,554.41. Of that amount, the PBGC asserts that $235,083.41 is an administrative claim or a priority wage claim. Further, the PBGC asserts that the balance of $66,471.00 is a general unsecured claim.

2. Subsequent to October 2, 1987, the date the Debtor submitted its Notice of Termination, Congress enacted the Pension Protection Act Pub.L. No. 100–203, 101 Stat. 1330, which amended Section 1341(c)(2)(B)(ii)(III) of ERISA, by adding (IV), to provide that the bank-

**(B) Determination by corporation of necessary distress criteria.**

Upon receipt of the notice of intent to terminate required under subsection (a)(2) of this section and the information required under subparagraph (A), the corporation [PBGC] shall determine whether the requirements of this subparagraph are met as provided in clause (i), (ii), or (iii). The requirements of this subparagraph are met if each person who is (as of the termination date) a contributing sponsor of such plan or a member of such sponsor's controlled group meets the requirements of any of the following clauses:

(i) Liquidation in bankruptcy or insolvency proceedings

The requirements of this clause are met by a person if—

(I) such person has filed, or has had filed against such person, as of the proposed termination date, a petition seeking liquidation in a case under Title 11, ... and

(II) such case has not, as of the proposed termination date, been dismissed.

(ii) Reorganization in bankruptcy or insolvency proceedings

The requirements of this clause are met by a person if—

(I) such person has filed or has had filed against such person, as of the proposed termination date, a petition seeking reorganization in a case under Title 11, ...

(II) such case has not, as of the proposed termination date, been dismissed,

(III) such person timely submits to the corporation any request for the approval of the bankruptcy court ...,
*and*

(IV) the bankruptcy court ... determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

(iii) Termination required to enable payment of debts while staying in business or to avoid unreasonably burdensome pension costs caused by declining workforce

The requirements of this clause are met by a person if such person demonstrates to the satisfaction of the corporation that—

(I) unless a distress termination occurs, such person will be unable to pay such person's debts when due and will be unable to continue in business, or

(II) the costs of providing pension coverage have become unreasonably burdensome to such person, solely as a result of a decline of such person's workforce covered as participants under all single-employer plans of which such person is a contributing sponsor.

29 U.S.C. Section 1341 (1982 and Supp. 1988). Accordingly, a debtor may terminate its pension plan pursuant to Section 1341(c)(2)(B)(ii) with court approval. Additionally a debtor may terminate its pension plan pursuant to Section 1341(c)(2)(B)(iii), without court approval, providing it can show that it will be unable to pay its debts when due and will be unable to continue in business *or* it can prove that the costs of providing coverage are unreasonably burdensome solely as a result of a decline in workforce.

Pursuant to the Federal Register Notice issued by the PBGC, the agency charged with the enforcement of the ERISA provisions, and dated October 15, 1987, the bankruptcy court is to look to the standards set forth in Section 365 of the Bankruptcy Code and in Section 1113 of the

---

ruptcy court must determine "that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process." 133 Cong.Rec. H12209 (Dec. 21, 1987). However, this statutory change applies to no-

tices of intent to terminate received by the PBGC after December 17, 1987. Because the Debtor's Notice of Intent to Terminate was received by the PBGC prior to December 17, 1987, this standard does not directly apply to the case at bar.

Bankruptcy Code (which deal with the rejection of executory contracts and collective bargaining agreements) to determine whether it should approve a distress termination pursuant to Section 1341(c)(2)(B)(ii). *See* Distress Terminations of Single–Employer Plans; Special Procedures Relating to the Reorganization Distress Test, 52 Fed.Reg. 38,290 (October 15, 1987). Section 1341(c)(2)(B)(iii), on the other hand, requires the PBGC to analyze the same factors that the bankruptcy court is likely to consider under Section 1341(c)(2)(B)(ii). To avoid the possibility of a conflict in findings between the bankruptcy court and the PBGC, pursuant to the Federal Register Notice, the PBGC will generally request that the bankruptcy court, when making a determination under 1341(c)(2)(B)(ii), make certain findings for purposes of Section 1341(c)(2)(B)(iii), and the PBGC agrees to be bound by those findings. *Id.*

In this case, the PBGC is asking the Court to determine whether, but for the distress termination, the Debtor will be unable to pay its debts when due and continue in business. The PBGC conceded that pursuant to the Federal Register Notice, it will be bound by the Court's finding for purposes of Section 1341(c)(2)(B)(iii). The Debtor, on the other hand, contends that the appropriate standard for purposes of Section 1341(c)(2)(B)(ii) is whether it will be unable to comply with the provisions of its confirmed Plan of Reorganization.

■ The parties do not dispute the fact that generally the bankruptcy court must give deference to an agency's interpretation of the statute involving its area of expertise. *See Mead Corp. v. Tilley,* —— U.S. ——, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989); *Belland v. PBGC,* 726 F.2d 839, 843 (D.C.Cir.1984), *see also, Nachman Corp. v. PBGC,* 592 F.2d 947 (7th Cir.1979), *aff'd* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), *rehearing denied* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). Giving deference to the agency's interpretations,

however, only "sets the framework for judicial analysis; it does not displace it." *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). The parties concede that in analyzing an agency's interpretation of its statute, the court should consider whether the interpretation is consistent with the plain language of the statute, its origins and its purpose.

In 1980, the Sixth Circuit defined the purpose of Title IV of ERISA as follows:

The purposes of Title IV are stated expressly in [Section] 1302(a): 1) to encourage the operation and continuation of private pension plans; 2) to protect employees' pension benefits; and 3) to keep the insurance premiums paid to the PBGC as low as possible. In addition the legislative history demonstrates the Congressional purpose of imposing employer liability in order to prevent employers from abusing the termination insurance program by shifting their financial burdens under pension plans to the PBGC or by making unrealistic promises to employees. (citations omitted).

*A–T–O, Inc. v. Pension Benefit Guaranty Corp.,* 634 F.2d 1013, 1025 (6th Cir.1980); *See* H.R.Rep. No. 99–300, 99th Cong. 1st Sess. 278 (1985), *reprinted in* 1986 U.S. Code Cong. & Admin.News 42, 929.

Additionally, in *Eastmet Corporation v. United Steelworkers of America, et al.,* the bankruptcy court further clarified what the debtor must prove under a distress termination. The bankruptcy court stated:

I believe it is simply not enough to come into court and say that continued funding of the pension plan is burdensome or that, in fact, payments have been missed or to file an affidavit which says that the debtor is incapable of making payments which is what was done in this case. It seems to me that there must be more detailed proof and there must be more of a showing of extreme need....

Without engraving these standards in stone, it seems to me that if it is agreed that a termination of such a plan, as in this case, is not automatic, then the bank-

ruptcy judge has to require that certain standards are met. And, one of those standards, it seems to me, is a showing by the debtor in possession that it has taken every means within its power to fund the plan according to the current terms embodied in the agreement between the company and the union.

This would include a showing of efforts made by management to reduce their own compensation, to take any and all steps to improve the efficiency of the operation, and to demonstrate what those steps are and what efficient procedures have been introduced and the effect of their implementation.

Slip op. at 2–3, No. 86–B–0035 (Bank.D.Md. September 29, 1986).

In this case, the Debtor's approach to interpreting the statute is misplaced. The issue is whether the PBGC's interpretation of Section 1341 is in harmony with the plain language of the statute, its origin and its purpose not whether the alternate interpretation set forth by the Debtor might also comply.

■ The Court has carefully reviewed the case law, the statute, and the Federal Register Notice and finds that the PBGC's interpretation of the statute encourages the operation and continuation of private pension plans, protects employee benefits, and keeps the insurance premiums paid to the PBGC as low as possible. Accordingly, the appropriate standard of review for the distress termination of a pension plan, pursuant to Section 1341(c)(2)(B)(ii), is whether but for distress termination, the Debtor will not be able to pay its debts when due and not continue in business.

In light of the Court's decision, the Court hereby grants the parties thirty (30) days from the date of this Memorandum Opinion and Order to complete discovery.

IT IS HEREBY ORDERED THAT:

1. The appropriate standard of review for a distress termination pursuant to Section 1341(c)(2)(B)(ii) is but for the termination of the pension plan, the debtor will not be able to pay its debts when due and will not be able to continue in business.

2. The parties are granted thirty (30) days from the date of this Order to complete discovery.