## In the Matter of SEWELL MANUFACTURING COMPANY, INC., Debtor.

### Bankruptcy No. N95–12163–WHD.

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

May 1, 1996.

Charles E. Campbell, Jeffery W. Cavender, Hicks, Maloof & Campbell, Atlanta, Georgia, for Debtor.

Jean Marie Breen, Office of the General Counsel, Pension Benefit Guaranty Corporation, Washington, DC, for PBGC.

### *ORDER*

W. HOMER DRAKE, Jr., Bankruptcy Judge.

Now before the Court in this case is the "Motion for Approval of Distress Termination of Sewell Manufacturing Company Cash Balance Pension Plan." As part of the Chapter 11 bankruptcy proceedings of Sewell Manufacturing Company, Inc. (hereinafter "the Debtor") and an integral step in the Debtor's termination of its defined benefit plan pursuant to the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), this matter constitutes a core proceeding within the subject matter jurisdiction of the Court. *See* 28 U.S.C. § 157(b)(2)(A) & (O); *see also* 29 U.S.C. § 1341(c)(2)(B)(IV). The Court having conducted an April 11, 1996 hearing on the Debtor's Motion and having orally ruled thereon, the following shall serve as written confirmation of that decision.

### Findings of Fact

The Debtor operates a garment manufacturing business from four plants located in Bremen, Temple and Bowdon Junction, Georgia, and in Heflin, Alabama. In the last year, the apparel maker posted sales of between $16 and $17 million, and it employed approximately 490 people on a regular basis. Like most members of the garment industry, however, the Debtor has suffered a signifi-

cant downturn in its sales and profits over the past five years. Compounding the damaging impact of its slump in sales, the Debtor's finances have sagged under the weight of certain obligations to former shareholders, as well as an unexpected trend by the company's pensioners to choose a lump sum distribution upon their retirement rather than receiving pension benefits by installment.[1] By virtue of the concerted drain that they have brought upon its finances, these several forces have left the Debtor in a position of insufficient capitalization and fiscal distress, leading it to commence its present reorganization case by filing a petition under Chapter 11 of the Bankruptcy Code on September 14, 1995.

Among the first steps to its reorganization process, the Debtor has filed with the Pension Benefit Guarantee Corporation (hereinafter "the PBGC") a distress termination notice, stating its intention to cancel its pension plan according to the terms of ERISA section 4041(c). Attempting to satisfy the statutory prerequisites for such a termination, the Debtor also has filed its present "Motion for Approval of Distress Termination of Sewell Manufacturing Company Cash Balance Pension Plan," seeking the Court's determination that, unless the plan is terminated, it will be unable to pay all of its debts pursuant to a plan of reorganization and unable to continue in business outside the Chapter 11 reorganization process.

On April 11, 1996, the Court conducted a hearing to determine the merits of the Debtor's motion. Seeking to demonstrate the scope of its financial woes and the manner in which its pension plan threatens its reorganizational and corporate survival, the Debtor then presented the testimony of a variety of experts, actuaries and officers within the corporation itself. Through the sum of their uncontroverted testimony, these witnesses demonstrated that, even without factoring in its pension obligations, the Debtor will continue to operate in a substantially cash negative mode well into the foreseeable future.[2] The evidence also showed that, if not terminated, the pension plan will heap an additional $2.3 million of near term debt upon the Debtor's already strained finances,[3] thereby turning its survival prospects from the bleak to the impossible.[4]

While not contesting the Debtor's substantive entitlement to a determination of financial necessity, the PBGC entered an appearance to contest the procedural satisfaction of certain allegedly prerequisite matters. Specifically, the PBGC argued that the submission of a plan of reorganization and the qualification of various "controlled group" entities under the provisions of ERISA's termination procedures must precede any determination of the Debtor's financial need for termination. Thus, to the extent that such matters had yet to be resolved, the PBGC contended that the Court could not undertake

---

1. In 1989, the Debtor amended its pension plan to provide retiring employees with a choice between receiving an immediate lump sum award or taking benefits via the traditional installment system. Response to the new lump sum option appears to have been overwhelming, to the point that the demands for immediate payment soon became a threat to the liquidity of the company's plan. (Tr. at 116).

2. In fiscal year 1996, the Debtor is expected to generate sales of approximately $14 million, with losses estimated at $400,000.00. This loss will translate into a negative cash flow of approximately $250,000.00 for fiscal year 1996. (Tr. at 54).

3. The Debtor must make a 1995 plan contribution of $1,678,959.00 on or before September 15, 1996. Immediately thereafter, the Debtor must contribute an additional $645,255.00 to satisfy its 1996 contribution requirements.

4. C.B. & T. of West Georgia has provided the Debtor with a $2 million line of credit to finance its post-petition operations. As a bank representative pointed out at trial, however, the cash collateral order makes no provision for using that credit line to finance the Debtor's upcoming pension obligations. Moreover, the Bank will not consent to such an application of the Debtor's credit line. (Tr. at 98–101).

Sale of the company to a buyer who might assume the pension obligations does not appear to be an option, either. (Tr. at 56–57). In fact, among the options of which the witnesses could conceive, the only means by which the Debtor could meet its upcoming pension obligations, as well as pay its current debts, would be for it to increase sales by seventy percent over the course of the next six months. (Tr. at 57). All parties appeared to concede that any plan for such an increase in business would be impossible to achieve under current industry conditions.

any finding regarding the financial necessity of the plan's termination.

## Conclusions of Law

### I. Distressed Pension Terminations by Reorganizing Employers—An Overview.

ERISA makes provision for the termination of benefit plans either through a voluntary proceeding commenced directly by the employer or through an involuntary action initiated by the PBGC. *See* 29 U.S.C. §§ 1341, 1342. Those terminations initiated by the employers themselves may take either a standard form, in which the employer's plan has sufficient assets on hand to satisfy all participants' claims, or a distressed form, in which the plan is underfunded. *See* 29 U.S.C. § 1341(a)(1).

Under the terms of the ERISA mandate, distressed terminations only may take place after the satisfaction of certain prerequisite criteria. The employer must give the PBGC 60 days notice of its intention to terminate, and it must satisfy certain disclosure requirements contained within the statute. 29 U.S.C. § 1341(c)(1)(A), (B). Furthermore, the employer, as well as each member of its controlled group, must demonstrate to the PBGC's satisfaction that they qualify under any one of three circumstances of "distress" set forth by ERISA—bankruptcy liquidation, bankruptcy reorganization, or some unbearable burden arising from either the employer's debt load or the pension plan itself. 29 U.S.C. § 1341(c)(2)(B)(i)–(iii).

For parties basing their satisfaction of the "distress criteria" upon an ongoing reorganization in bankruptcy, ERISA sets outs a four-part test by which the PBGC should gauge the termination's propriety. Under that standard, a reorganization in bankruptcy will give rise to sufficient "distress" only if the PBGC finds that:

(I) such person has filed, or has had filed against such person, as of the proposed termination date, a petition seeking reorganization in a case under Title 11

\* \* \* \* \* \*

(II) such case has not, as of the proposed termination date, been dismissed,

(III) such person timely submits to the [PBGC] any request for the approval of the bankruptcy court (or such other appropriate court) of the plan termination, and

(IV) the bankruptcy court (or such other appropriate court) [has determined] that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

29 U.S.C. § 1341(c)(2)(B)(ii). Thus, by its terms, ERISA predicates the satisfaction of its reorganizational distress criteria upon the existence of an active Chapter 11 case, as well as a finding of financial necessity by the bankruptcy court. Despite the presence of this latter requirement, however, no bankruptcy court decision reported thus far appears to have undertaken the examination called for by section 1341(c)(2)(B)(ii)(IV).[5] As a consequence, the Court finds itself faced not only with the substantive determination required by that section, but also with a variety of preliminary questions regarding the proper procedural context in which to measure the Debtor's financial necessity.

### II. Properly Timing a Bankruptcy Court's Determination Under Section 1341(c)(2)(B)(ii)(IV).

A. *Must the Debtor Submit a Plan and Disclosure Statement before the Court May Make Its "Financial Necessity" Determination?*

■ In the instant case, the Debtor has not yet submitted a Chapter 11 plan of reorganization and accompanying disclosure statement, apparently deferring the matter until its attempt to terminate its sizeable pension funding obligation has been conclud-

---

**5.** In one case, *In re Resol Mfg. Co., Inc.,* 110 B.R. 858 (Bankr.N.D.Ill.1990), the court found itself faced with a Chapter 11 distressed termination in the window between the aforementioned provision's adoption and its effective date. The *Resol* court, however, limited the scope of its discussion to the propriety of applying the new standard to the case before it and did not delve into the provision's substantive application. *See id.* at 859–62.

ed. As reasonable as this "wait and see" approach to plan formulation might seem under the circumstances, the PBGC nevertheless points out that section 1341(c)(2)(B)(ii)(IV) will require the Court to determine whether the Debtor will be "unable to pay all of its debts pursuant to a reorganization plan." *See* 29 U.S.C. § 1341(c)(2)(B)(ii)(IV). As such, the PBGC contends that the Debtor's submission of a plan and disclosure statement forms a necessary precondition to any court effort to determine the financial necessity of the pension plan's termination.

In response, the Debtor asserts that it cannot possibly develop or even negotiate a plan of reorganization until it is known whether the pension plan, which constitutes an overwhelming portion of its present debt load, actually may be terminated. Thus, according to the Debtor, it would be pragmatically impossible for it to produce a reorganization plan prior to the Court's hearing on the pension termination's financial necessity and the disposition of its application to terminate the plan. Indeed, much to the contrary, the Debtor reasons that the Court's determination of financial necessity itself poses a necessary prerequisite to the formulation of a reorganization plan.

Like the Debtor, the Court finds several flaws in the position advanced by the PBGC. First, the Court believes that construing plan submission as a precondition to any necessity analysis would contradict the spirit, if not the text, of the ERISA provision to be applied. Section § 1341(c)(2)(B)(IV) qualifies its reference to the debtor's ability to pay in terms of "a" plan of reorganization, not "its" plan, or even "the" plan. *See* 29 U.S.C. § 1341(c)(2)(B)(IV). As such, the provision appears to contemplate a more abstract examination of a debtor's financial abilities than that preconditioned upon the development of a specific reorganization plan. Similarly, the text of 29 U.S.C. § 1341(c)(2)(B)(IV) frames the inquiry which it demands of a bankruptcy court in the future tense, i.e., whether the Debtor *will* be able to pay under a plan, instead of whether the Debtor *is* able to pay under the plan. Like the section's non-specific reference to "a plan," this prospective

phrasing also appears to suggest the permissibility of undertaking a financial necessity analysis well in advance of any particular plan's development or adoption.

Moreover, the Court finds that adopting the PBGC's suggested treatment of the reorganization plan would countermand the policies that lie at the heart of the bankruptcy process. As the Debtor has pointed out, for those employers whose pension obligations mark a significant portion of their ongoing debt load, negotiation and development of any confirmable plan of reorganization will remain an unwieldy matter of speculation until the termination question finally has the benefit of resolution. More importantly, forcing the Debtor upon such a conjecturous tangent would effect a wasteful depletion of the estate's resources, in contradiction of bankruptcy's primary goal of asset conservation and distribution. *See United States v. Noland (In re First Truck Lines, Inc.),* 48 F.3d 210, 215 (6th Cir.1995) (quoting *Simonson v. Granquist,* 369 U.S. 38, 40, 82 S.Ct. 537, 538–39, 7 L.Ed.2d 557 (1962)). Since the negotiation and development of a plan marks one of the most costly administrative tasks facing a Chapter 11 debtor, the interest of the creditors demands that such an exercise be conducted in the most efficient and cost effective manner possible. *See e.g., In re Public Serv. Co. of New Hampshire,* 88 B.R. 558, 562 (Bankr.D.N.H.1988); *Manville Corp. v. Equity Security Holders Committee (In re Johns–Manville Corp.),* 66 B.R. 517, 525 (Bankr.S.D.N.Y.1988) (noting one party's comparison of the plan development process to negotiating an end to the nuclear arms race). That said, the Court cannot condone the invention of a standard that causes an unnecessary duplication of those efforts and, thereby, contravenes bankruptcy's twin purposes of asset preservation and equitable distribution. *See* 29 U.S.C. § 1144(d) (presenting ERISA savings clause which directs that "nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States"); *see also Checkett v. Vickers (In re Vickers),* 954 F.2d 1426, 1428–29 (8th Cir. 1992) (ERISA may not be interpreted so as to confound the clear intentions of the Bankruptcy Code's drafters). Given the impact of

these pressing considerations and the qualified nature of the underlying ERISA provision, the Court finds it clear that the Debtor need not have submitted a plan of reorganization prior to a bankruptcy court's determination of the plan termination's financial necessity under section 1341(c)(2)(B)(ii)(IV).

B. *Must All Members of the Debtor's "Controlled Group" Already Have Been Isolated and Found to Qualify Under Some Recognized Circumstance of "Distress"?*

 In a second contest to the ripeness of the "financial necessity" determination, the PBGC points out that certain companies bearing some relation to the Debtor may in fact qualify as members of its controlled group for the purposes of section 1341(c)(2)(B).[6] Moreover, to the extent that these third parties have neither been definitively qualified as "controlled group" members nor been found to have satisfied any of ERISA's distress criteria, the PBGC argues that the Court should not at this time conduct any determination regarding the financial necessity of termination as measured from the perspective of the Debtor.

The requirement that all controlled group members qualify under section 1341(c)(2)(B) parallels that applicable to the employer's own search for qualification. According to the statutory mandate, each party must fall within one of the distress criteria categories in order for termination to occur. *See* 29 U.S.C. § 1341(c)(2)(B). Consequently, like the Debtor's own showing of "distress," the qualification of any "controlled group" enti-

ties under section 1341(c)(2)(B) will form a key element in the Debtor's final application for termination and a precondition to the Debtor's success in terminating its pension liability. *Id.*

 Here, however, the Court does not find itself faced with the ultimate question of the Debtor's entitlement to the termination of its pension plan. Instead, the Court simply must perform one narrow factual determination, the satisfaction of which will compose a single element in the Debtor's individual case for reorganizational "distress." The ultimate sufficiency of that distress showing, as well as the adequacy of the Debtor's required disclosures and the qualification of any "controlled group" parties, then will become a collective matter for the PBGC's consideration as it makes a final determination of the Debtor's right to a distressed termination. *See* 29 U.S.C. § 1341(c)(1)(A), (c)(2)(B). Until that point of determination, however, the Debtor's failure to have satisfied all prerequisites to a distressed termination should have no significance or consequence.[7] Most importantly, the Debtor's failure to fulfill such parallel requirements should have no bearing upon the procedural ripeness of the narrow question now facing the Court.

### III. Applying the Standard of Section 1341(c)(2)(B)(ii)(IV) to the Present Case.

 In the instant case, no doubt can exist that the Debtor's near term financial picture is tenuous at best. Before taking into ac-

---

6. A contributing sponsor's "controlled group" consists of: (1) the sponsor/employer, and (2) all other entities under "common control" with that plan sponsor. 29 U.S.C. § 1301(a)(14)(A). In turn, PBGC regulations provide that parties are under "common control" if they qualify either as a "controlled group of corporations" or as "two or more trades or businesses under common control" pursuant to the terms of the Internal Revenue Code. *See* 29 C.F.R. § 2612.3(b)(2); *see also* 26 U.S.C. § 414(b) & (c). In this case, the PBGC contends that two entities, Eagle Resources, Inc. and Holly Springs, Inc., may fall within this "controlled group" criteria as it applies to the Debtor.

7. Thus, the Court also rejects a related challenge which the PBGC has based upon the Debtor's

failure to complete its obligations of disclosure pursuant to 29 U.S.C. § 1341(c)(2)(A). Fulfillment of the disclosure requirements stands as a necessary element of the termination procedure as well as a precondition to the PBGC's final evaluation of the "distress criteria." *See* 29 U.S.C. § 1341(c)(1)(B) (employer may terminate only if disclosures are made); *see also* 29 U.S.C. § 1341(c)(2)(B) (upon receipt of disclosure materials, the PBGC shall make its distress criteria evaluation). Notwithstanding its importance as an element in the broader process of termination, however, the satisfaction of the disclosure requirement does not stand as a precondition to the resolution of the narrow issue before the Court.

count any pension obligations, parties familiar with the Debtor's finances expect that it will suffer a negative cash flow of over $200,000.00 in the current fiscal year. Indeed, if it is to survive at all, the Debtor must make substantial improvements upon its current position and take significant steps to boost its sales.

Through its 1995 and 1996 contribution requirements, the Debtor's pension plan threatens to saddle another $2.3 million of near term debt upon this already precarious financial position. The lender that has provided post-petition financing in this case will not agree to subsidize the plan obligations by financing these upcoming contributions. Sale of the company to a buyer who might assume the pension obligations does not appear to be an option, either. In fact, the only means by which the Debtor theoretically could meet its upcoming pension obligations, as well as pay its current debts, would be for it to increase sales by seventy percent over the course of the next six months, a task which the Court believes to be impossible under current industry conditions. As such, the Court finds it clear in this case that, unless the plan is terminated, the Debtor will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process. *See* 29 U.S.C. § 1341(c)(2)(B)(ii).

## CONCLUSION

Having given the matter its careful consideration, the Court finds that the Debtor need not have submitted a plan of reorganization prior to the bankruptcy court's analysis of the plan termination's financial necessity under section 1341(c)(2)(B)(ii)(IV) and that its failure yet to have satisfied certain parallel criteria to termination likewise does not preclude such an evaluation. Therefore, this case stands procedurally ripe for such a determination by the Court.

Also, given the condition of its finances, the Court finds that the Debtor will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process unless its pension plan is terminated. Thus, it hereby is **ORDERED** that, to the extent contemplated by ERISA's procedures, the Debtor's application for a distressed termination has the Court's endorsement and approval. *See* 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

**IT IS SO ORDERED.**