**In re WIRE ROPE CORPORATION OF AMERICA, INCORPORATED, Debtor.**

No. 02–50493–JWV.

United States Bankruptcy Court, W.D. Missouri.

Dec. 30, 2002.

Eric L. Johnson, Lisa A. Epps, Scott J. Goldstein, Spencer, Fane, Britt & Browne, Kansas City, MO, for Debtor.

Sherri L. Wattenbarger, Kansas City, MO, United States Trustee.

Daniel J. Flanigan, Diane C. Browning, James E. Bird, Polsinelli, Shalton & Welte,

P.C., Kansas City, MO, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION AND ORDER

Jerry VENTERS, Bankruptcy Judge.

In this Chapter 11 proceeding, the debtor and debtor-in-possession, Wire Rope Corporation of America, Incorporated, ("Debtor") presents a unique issue of first impression in this Court and an issue that apparently has not been addressed by the Eighth Circuit Court of Appeals—the "distress termination" of three employee retirement plans pursuant to provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

Succinctly stated, the Debtor asserts that it will be unable to successfully reorganize under Chapter 11 of the Bankruptcy Code and will be unable to continue in business outside the Chapter 11 reorganization process if the retirement plans are not terminated. The Debtor's Motion for Approval of Distress Termination (Document # 277; the "Motion") was unopposed and the evidence in support of it was uncontradicted. The Official Committee of Unsecured Creditors ("Creditors' Committee") supported the Motion, as did HSBC Business Credit (USA), Inc., ("HSBC") the Debtor's primary pre-petition secured lender and the lender providing the Debtor's post-petition debtor-in-possession financing.[1] John P. (Jack) Barclay, the largest shareholder of the company and a major creditor, initially filed written Objections to the Motion but at hearing announced that he would not oppose the Motion. The Pension Benefit Guaranty Corporation ("PBGC") filed a written Re-

---

1. HSBC has acted in this case as agent for itself, National Bank of Canada, and GMAC Canada Ltd., who are providing the Debtor's financing as stated in the body. They will be collectively referred to herein as "HSBC."

sponse in which it did not oppose the distress termination of the retirement plans, but urged the Court to require the Debtor to present evidence of the factual and legal grounds for termination so as to enable the Court to make the necessary determinations to meet ERISA's strict criteria for distress terminations.[2] United Steelworkers of America Locals 5783 and 1303, the unions that represent the Debtor's organized employees, did not file any responsive pleadings and stated that they did not oppose the termination of the retirement plans.

The Court held a hearing on the Motion in Kansas City, Missouri, on December 6, 2002. Only the Debtor presented evidence. Because of the potential that substantial additional liabilities will be incurred if the retirement plans are not terminated before the end of 2002, the Debtor, the Creditors' Committee, and HSBC urged the Court to rule the Motion before December 31, 2002. After hearing the evidence and the statements of counsel, the Court took the matter under advisement. The Court has reviewed the evidence and the relevant statutory and case law and is now prepared to rule.

The Court is firmly convinced that the Debtor cannot reorganize in Chapter 11 and cannot continue to operate successfully outside Chapter 11 unless the retirement plans are terminated, as requested by the Debtor and provided by ERISA. Therefore, for the reasons set out below, the Court will grant the Debtor's Motion, thereby allowing the Debtor to proceed with termination of the retirement plans

effective on December 31, 2002, pursuant to the PBGC's guidelines and criteria.[3]

## FACTUAL FINDINGS AND BACKGROUND

The Debtor had established three retirement plans prior to commencing this voluntary Chapter 11 case on May 15, 2002, and those retirement plans are at issue in this proceeding. They are: (a) Second Restated Retirement Plan for Bargaining Unit Employees (the "Bargaining Unit Retirement Plan"); (b) Second Restated Retirement Plan for Hourly Employees (the "Hourly Employees Retirement Plan"); and (c) Second Restated Retirement Plan for Salaried Employees (the "Salaried Employees Retirement Plan"). Though the retirement plans had been established earlier, the Second Restated Plans were all implemented effective on January 1, 1997. (The plans will be referred to herein collectively as the "Retirement Plans" or simply "the Plans.") Prior to the end of October 2002, the Debtor filed the necessary forms (Exs. 13, 14, 15) to notify the PBGC of its intention to terminate the Plans, and the PBGC has made a tentative determination that the notices appear to be in compliance with the federal regulations governing distress terminations. According to the PBGC's Response, 1,758 current and former employees of the Debtor are covered by the Plans.

Although the estimated cost of termination of a retirement plan is not one of the factors specified under the statute for a distress termination, the Debtor nonetheless adduced evidence with respect to

---

**2.** This response is in conformity with the PBGC's stated duties as set out at 29 C.F.R. § 4041.41(d)(1)(i).

**3.** The Court has jurisdiction of this matter pursuant to 28 U.S.C. § § 1334 and 157(a). This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2)(A). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law as provided by Rule 7052, Fed.R.Bankr.P., made .applicable to this matter by Rule 9014, Fed. R.Bankr.P.

the Debtor's liabilities in the event of termination of the Plans.[4] The amount of unfunded benefit liabilities due all participants and beneficiaries under the Plans if they are terminated is referred to as the "termination shortfall."

Patrice Beckham, the consulting actuary for the Plans for the last 12 years, calculated the potential termination shortfall using three different discount rates.[5] Based on total Plan assets of $45.1 million on November 22, 2002, Beckham estimated the Plans' liabilities on December 31, 2002, using three different discount rates:

| Plan | Estimated Liability | | | Estimated Shortfall | | |
|---|---|---|---|---|---|---|
| | 10% | 7.1% | PBGC [6] | 10% | 7.1% | PBGC |
| Bargaining Unit | $21.4 | $27.3 | $32.9 | $4.1 | $10.0 | $15.6 |
| Hourly Employees | 5.2 | 7.2 | 9.5 | 1.9 | 3.9 | 6.2 |
| Salaried Employees | 24.8 | 32.4 | 39.7 | 0.3 | 7.9 | 15.2 |
| Total | $51.4 | $66.9 | $82.1 | $6.3 | $21.8 | $37.0 |

(Ex. A to Ex. 4)(amounts shown in millions of dollars)

Therefore, assuming the highest rate of return (10%) on invested funds, the estimated shortfall in the event of termination on December 31, 2002, would be $6.3 million. If the mid-range rate of 7.1% is applied, the shortfall would be an estimated $21.8 million. The worst-case scenario, using the PBGC's more conservative discount rates, would be a termination shortfall of $37 million. It is not necessary for the Court to determine an appropriate discount rate for purposes of the present motion, although that might become necessary when it comes time to determine the amount of the PBGC's termination claim. For sake of the present discussion, and without pre-judging what the appropriate

discount rate should be, the Court will use the 7.1% discount rate, that being the mid-range of the rates used by Beckham in her calculations, and will therefore assume that the termination shortfall would be $21.8 million if the Plans are terminated as of December 31, 2002.

Incidentally, mismanagement of the funds has not been suggested. According to Beckham, four factors have contributed to the underfunding of the Plans. For one thing, the drastic decline in stock prices over the last two years has reduced the value of the Plans' investments significantly. Concomitantly, recent lower interest rates have increased the cost of purchasing annuities for retirees. Thirdly, because of high investment returns in the 1990s, contributions were not always required of the

4. The Court finds this information relevant and helpful to its decision in this case, particularly since the cost of termination may have a significant impact on the bankruptcy estate.

5. The discount rate is an assumed annual rate of return on invested funds. In order to determine present value, an assumption as to the annual rate of return on invested funds must be made. Once the rate of return is set, the expected future benefit payments are dis-

counted back to the valuation date. If all assumptions are met in the future, an asset value equal to the "present value" plus future investment earnings would be sufficient to pay all future benefit payments. (Ex. 4, p. 2)

6. The published PBGC discount rate used by Beckham was 5.30% for the first 25 years and 4.25% for all additional years.

Debtor to meet minimum funding requirements, and accordingly contributions were not made in some years. Finally, recent amendments were made to the Plans that have increased their liabilities, but there has been insufficient time to fully fund those liabilities.

The termination shortfall includes a minimum funding contribution that would be required to be made for the period from May 15, 2002, until December 31, 2002, for post-petition services rendered by employees, of between $358,000.00 (using a 10% discount rate) and $796,000.00 (using the PBGC rates). Using a 7.1% discount rate, the amount of minimum funding contributions for the post-petition period would be $557,000.00.

Next, and more important to the Court's decision, Beckham projected the cash contributions that would be required to meet statutory minimum funding requirements through 2006 should the Debtor continue with the Retirement Plans (i.e., if they are *not* terminated). Assuming an investment return of 7.1% for 2003 through 2005, and making other assumptions that generally assume the continuation of the Plans without change, Beckham projected that the Debtor would be required to make cash contributions to the Plans totaling $20.7 million through the year 2006. (Ex. B to Ex. 4)

Ira Glazer, an outside consultant who has served as the Debtor's chief restructuring officer and chief executive officer during the bankruptcy proceedings, testified that this projected $20.7 million minimum funding requirement over the next four years would prevent the Debtor from attracting long-term financing to enable it to exit from Chapter 11, would effectively prohibit the Debtor from attracting necessary equity investors, and would prevent the company from surviving outside bankruptcy, even assuming it could attract the financing and equity investments necessary to enable it to obtain confirmation of a reorganization plan and emerge from the bankruptcy process.

Glazer testified that, based on his experience in this and other similar cases, the uncertainty of the Debtor's liability for the Retirement Plans would prevent the Debtor from obtaining necessary financing and equity investment because the minimum funding contributions—whether $20.7 million or some greater or lesser amount— will have to be paid over the next four years if the Plans are not terminated now. Douglas Bury, the loan officer who has handled the Debtor's loan for HSBC, the Debtor's primary pre- and post-petition secured lender, testified that HSBC will not continue financing the Debtor unless the Retirement Plans are terminated. At present, the Debtor's DIP financing is to expire on December 21 of this year; HSBC will consider extending the DIP facility to February 28, 2003, only if certain conditions are met, including the filing and confirmation of a plan of reorganization and the obtaining of other financing.[7] HSBC is not a candidate to provide long-term financing for the Debtor post-confirmation. Bury testified that, in his opinion, the Debtor will not be able to obtain other financing unless the Retirement Plans are terminated.

Likewise, potential equity investors are not willing to consider a recapitalization of the Debtor unless the Plans are terminated. Glazer testified that, in order to successfully reorganize, the Debtor will have to have a minimum equity investment of

7. Since the hearing on December 6, the Debtor and HSBC have entered into an agreement to extend the Debtor's DIP financing to February 28, 2003, and that agreement has been approved by the Court, without opposition. (Document # 389)

$10 million. The managing partner of one entity interested in a possible equity investment wrote that "the potential uncertainty around these liabilities would make it impossible for us to proceed with a definitive proposal to recapitalize" the Debtor. (Ex. 17) Another equity investor took a similar position. (Ex. 16)

Even assuming the Debtor could obtain new long-term financing and the necessary $10 million equity infusion, Glazer testified that the company's earnings would be insufficient to enable the Debtor to meet the minimum funding requirements for the Plan. In drafting a plan of reorganization, Glazer has projected "free cash flow"— that amount remaining after debt service required by the proposed plan—of $2,746,010.00 in 2003, $3,447,606.00 in 2004, and $4,585,775.00 in 2005. In those same three years (including the unpaid contributions for 2002), the total liability to the Retirement Plans would be $16.4 million, thus a shortfall of more than $6 million even if the entire amount of the Debtor's "free cash flow" should be applied to pay the minimum funding contributions.

Additional facts will be developed as necessary in the Discussion section to follow.

## DISCUSSION

The provisions for the "distress termination" of a pension or retirement plan covered by the Employee Retirement Income Security Act of 1974, popularly known as ERISA, are set out at 29 U.S.C. § 1341(c)(2)(B). The statute sets out the exclusive means for termination of single-employer pension plans. 29 U.S.C. § 1341(a). Such a plan may be terminated only in a standard termination under § 1341(b) or a distress termination under § 1341(c). 29 U.S.C. § 1341(a)(1). Not less than 60 days before the proposed termination date, the plan administrator must provide each affected party with a written notice of intent to terminate, stating that termination is intended and stating the proposed termination date. 29 U.S.C. § 1341(a)(2). In order to obtain a distress termination, the sponsor of the pension plan(s) must meet one of four statutory requirements contained in 29 U.S.C. § 1341(c)(2)(B): (i) liquidation in bankruptcy; (ii) reorganization in bankruptcy; (iii) inability to pay debts when due; or (iv) unreasonably burdensome pension costs. In this case, the Debtor seeks termination of its three Retirement Plans under the "reorganization in bankruptcy" provision, 29 U.S.C. § 1341(c)(2)(B)(ii). That statute provides:

(B) Determination by the corporation [the PBGC] of necessary distress criteria

Upon receipt of the notice of intent to terminate required under subsection (a)(2) of this section and the information required under subparagraph (A), the corporation shall determine whether the requirements of this subparagraph are met as provided in clause (i), (ii), or (iii). The requirements of this subparagraph are met if each person who is (as of the proposed termination date) a contributing sponsor of such plan or a member of such sponsor's controlled group meets the requirements of any of the following clauses:

\* \* \* \* \* \*

(ii) Reorganization in bankruptcy or insolvency proceedings

The requirements of this clause are met by a person if—

(I) such person has filed, or has had filed against such person, as of the proposed termination date, a petition seeking reorganization in a case under Title 11 or under any similar law of a State or political subdivision of a State

(or a case described in clause (i) filed by or against such person has been converted, as of such date, to such a case in which reorganization is sought),

(II) such case has not, as of the proposed termination date, been dismissed,

(III) such person timely submits to the corporation any request for the approval of the bankruptcy court (or other appropriate court in a case under such similar law of a State or political subdivision) of the plan termination, and

(IV) the bankruptcy court (or such other appropriate court) determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

29 U.S.C. § 1341(c)(2)(B)(ii).

■ It is not for this Court to determine whether the Debtor has satisfied or will satisfy, as of the termination date, the first three criteria of § 1341(c)(2)(B)(ii). Those are determinations to be made by the PBGC. The only question for this Court is whether the Debtor has satisfied the requirements of § 1341(c)(2)(B)(ii)(IV). Under this provision, this Court can approve the termination of the Debtor's Retirement Plans only if it finds that, unless the Plans are terminated, the Debtor (1) will be unable to pay all of its debts under a plan of reorganization *and* (2) will be unable to continue in business outside of bankruptcy. The statute clearly places the burden of proof for a distress termination on the sponsor of the plan, or in this case the Debtor.

The distress termination provisions were enacted by Congress as part of the Single-Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99–272, 100 Stat. 237, and were amended by the Pension Protection Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330. The purpose of the legislation is to limit "to cases of severe business hardship" the ability of plan sponsors to terminate their pension plans and thereby shift liability for guaranteed benefits onto other insurance premium payers in the PBGC program and avoid responsibility for the payment of certain nonguaranteed benefits. H.R.Rep. No. 300, 99th Cong., 1st Sess. 279 (1985), *reprinted in* 1986 U.S.C.C.A.N. 930. There must be a specific finding by the court that "unless a distress termination occurs, the person will be unable to pay its debts when due and to continue in business." 29 C.F.R. § § 4041.41(c)(3) and (d)(1). *See also In re Resol Mfg. Co.*, 110 B.R. 858, 862 (Bankr.N.D.Ill.1990) ("the appropriate standard of review...pursuant to Section 1341(c)(2)(B)(ii) is whether but for the termination of the pension plan, the debtor will not be able to pay its debts when due and will not be able to continue in business").

There is virtually no case law involving the application of the distress termination provisions of § 1341. It appears the Eighth Circuit Court of Appeals has not been presented with this question. Therefore, the Court writes on largely a clean slate in this instance.

■ Before examining the Debtor's ability to pay all of its debts under a plan of reorganization if the Retirement Plans are not terminated, the Court believes a more basic, threshold question must be resolved. That question is: Can the Debtor obtain confirmation of *any* plan of reorganization without the termination of the Retirement Plans? If the Debtor cannot obtain confirmation of a plan of reorganization in the

first instance, then it clearly cannot pay its debts under a plan of reorganization, and the Court's approval of a distress termination of the Retirement Plans would be warranted.

Based on the uncontroverted evidence before it, the answer to that question, the Court is convinced, is that the Debtor cannot, in fact, obtain confirmation of *any* plan of reorganization unless the Retirement Plans are terminated, and therefore the requirements of the statute are met for approval of a distress termination of the Plans. The unchallenged testimony was that the Debtor will not be able to obtain either debt or equity financing unless the Plans are terminated, primarily because of the uncertainty of the Debtor's future obligations to the Plans. Glazer, the Debtor's chief restructuring officer, testified that the Debtor had circulated the Debtor's preliminary draft of a plan of reorganization to approximately 59 entities or parties, and that expressions of interest in the company have been received from only three parties. All of those interested parties—two indicating a possible interest in debt financing and one expressing a possible interest in an equity investment—have indicated that a condition of any investment would be the termination of the Retirement Plans. HSBC, which has provided (with other lenders) the Debtor's DIP financing—which is in the range of $35 million—is not interested in providing post-confirmation financing to the reorganized Debtor, and HSBC's loan officer, who has years of experience in this field, testified that he believed the Debtor could not obtain exit financing to enable it to obtain confirmation of a plan of reorganization unless the Plans are terminated.

The statute requires as a condition of a distress termination that the court find that the debtor "will be unable to pay all of its debts pursuant to a plan of reorganiza-tion..." unless the retirement plans at issue are terminated. 29 U.S.C. § 1341(c)(2)(B)(IV). In order to pay its debts pursuant to a plan of reorganization, a debtor must first be able to obtain confirmation of such a plan. It is clear to the Court in the present case that the Debtor will not be able to obtain either the debt financing or the equity financing—and both appear to be required if the company is to survive—that would enable it to obtain confirmation of a plan of reorganization.

Nor is it likely that the Debtor would be able to operate outside bankruptcy if the Plans are not terminated, which is the second prong of the distress termination test for reorganizing companies. The Debtor will need approximately $35 million in long-term debt financing and an additional $10 million in equity investment if it is to have a reasonable likelihood of success outside bankruptcy, according to Glazer. Glazer testified, without contradiction, that lenders and equity investors are unwilling to commit or invest such sums with the uncertainty of the pension plan obligations looming over the Debtor. There is an apparent belief among lenders and investors that the estimated $20.7 million in required minimum funding contributions over the next four years could come ahead of other corporate obligations, including repayment of secured debt. Whether such fears are accurate or justified, it is certainly understandable that lenders and investors would be reluctant to extend credit to the Debtor and take an equity position in the Debtor when the Debtor has such an imposing contribution requirement in its immediate future. Just as the Debtor cannot expect to obtain confirmation of a plan of reorganization unless the Retirement Plans are terminated, it is equally obvious that the Debtor cannot obtain the debt and equity financing it needs to continue in business outside the

Chapter 11 reorganization process without first terminating the Retirement Plans. All of the evidence supports this conclusion.

■ Assuming, however, that the Debtor *could* secure confirmation of a plan of reorganization, we must examine whether the Debtor would be able to pay its debts under a confirmed plan and continue in business outside the Chapter 11 proceedings.

The only published case involving the substantive application of the distress termination provisions appears to be *In the Matter of Sewell Manufacturing Company, Inc.,* 195 B.R. 180 (Bankr.N.D.Ga. 1996). In that case, the Bankruptcy Court gave its endorsement and approval to the Debtor's proposed distress termination of its retirement plan. The Court found that the debtor was expected to suffer negative cash flow of more than $200,000.00 in its current fiscal year, that its pension plan contributions required to meet minimum funding requirements would saddle the company with $2.3 million of near-term debt, that the debtor's lender had refused to finance these required contributions, and that sale of the company to a buyer who might assume the pension plan obligations was not a viable option.

In the case at hand, the Debtor's immediate cash flow projections are not so dire as those in the *Sewell Manufacturing* case, but the burdens imposed by the Debtor's Retirement Plans are many times greater, and the prospects of corporate survival are every bit as bleak without the termination of the retirement plans.

Here, the Debtor is coming off a string of three years in which it has lost more than $30 million. In 1999, the losses were

$4.717 million, in 2000 they were $2.892 million, and in 2001 the losses were a staggering $26.652 million. In May of this year, the company filed its bankruptcy petition, and no evidence was presented as to the Debtor's anticipated profit or loss for 2002. However, the Debtor's chief restructuring officer, Glazer, paints a more optimistic picture for the future. For the years 2003 through 2005, Glazer projects earnings[8] of $15,218,367, $16,478,675, and $17,728,791, respectively. After the payment of interest and bank fees, taxes, capital expenditures, and restructuring costs, the amounts available for debt service would be $7,243,277 in 2003, $7,232,582 in 2004, and $8,302,275 in 2005. (Ex. 3) These amounts total $22,778,134 for the three years.

It will be recalled that the Debtor's actuary projected that the minimum funding requirements for the Debtor's three Retirement Plans through 2006—including an anticipated shortfall of $1.1 million for 2002—would be $20.7 million. (Ex. B to Ex. 4) That amount is almost equal to the entire amount of anticipated profits—before *any* debt service—over the next three years ($22,778,134, as set out in the preceding paragraph). Therefore, to continue with the Retirement Plans, the Debtor would have to use virtually all of its available cash flow simply to meet the minimum funding requirements of the Retirement Plans, and would be able to pay virtually nothing on its current debts. While the Debtor arguably might be able to continue in business without making any payments on its unsecured debt, there is little question that the Debtor will not be able to remain in business for long if it cannot make the required payments on its secured debt (which is substantial).

---

**8.** Glazer's earnings figures are before deductions for interest, taxes, depreciation and amortization, or EBITDA.

As presently proposed in its draft stages, the Debtor's plan of reorganization anticipates debt service payments of $4,497,267.00 in 2003, $3,784,976.00 in 2004, and $4,717,500.00 in 2005.[9] These debt service payments would include $1 million a year for the general unsecured creditors. Glazer testified that the plan as presently drafted proposes to pay the general unsecured creditors—including the termination liability of the PBGC—a total of $10 million over 10 years, at the rate of $1 million a year, and that the unsecured creditors may also receive some type of equity interest in the company at the end of the 10 years, though that feature of the plan has not yet been finally determined. Glazer estimated that the general unsecured claims, including an estimated termination liability of $8 million to the PBGC, will be $23 million. Thus, the plan would propose to pay the general unsecured creditors, including the PBGC, approximately 43.5% of the amount of their claims.

According to Glazer's projections, after making the debt service payments set out above, the Debtor would then have "free cash flow" of $2,746,010.00 in 2003, $3,447,606.00 in 2004, and $3,717,500.00 in 2005, a total of approximately $9.9 million for those three years. However, in those same three years, according to the actuary, the estimated cash contributions required to meet the minimum funding requirements for the Plans would be $3.1 million in 2003, $6.5 million in 2004, and $5.5 million in 2005, a total of approximately $15.1 million. Therefore, the Debtor would be unable to meet the minimum funding requirements for those three years by approximately $5.2 million, even

if it used all of its "free cash flow" to meet the minimum funding requirements. And, this discussion ignores the $1.1 million that will be required to make up the funding shortfall in 2002. Under this analysis, then, the Debtor could not be expected to pay its debts under the proposed plan of reorganization and continue in business unless the Retirement Plans are terminated.[10]

In its response to the Debtor's Motion, the PBGC suggested that, before it could allow the distress termination of the Retirement Plans, the Court would have to find that, *but for* the termination of the Plans, the Debtor would be forced into liquidation. The import of this statutory standard, the PBGC argues, "is that creditors sometimes will have to accept lower recoveries in order to allow a pension plan to continue as long as *some* plan of reorganization is feasible without termination of the pension plan." The PBGC further argues that the Court should not find that the reorganization test for a distress termination has been met "unless the Debtor introduces sufficient factual information to enable the Court to evaluate the Debtor's other options and to conclude that a distress termination is the *only feasible* alternative to liquidation." (PBGC Response, pp. 7–8; emphases in original)

While the Court does not necessarily accept the PBGC's argument in toto, the Court does believe that the Debtor has presented sufficient evidence to demonstrate that it has only two viable alternatives: It may either terminate the Retirement Plans and then attempt to obtain the debt and equity financing it requires to

---

9. The Debtor's Plan of Reorganization presently is due to be filed by February 10, 2003.

10. The Court has assumed, for purposes of this discussion, that Glazer's projections of the company's future profits are accurate.

Considering the Debtor's recent history of losses, achieving the profit projections made by Glazer would represent quite a remarkable turnaround, but perhaps new management can do it.

continue in business under a confirmed plan of reorganization, or it may attempt to continue with the Retirement Plans and most likely go out of business. The Court is convinced that the Debtor would, most likely, be forced into liquidation if it is not allowed to terminate its Retirement Plans, because it cannot both pay its debts under a plan of reorganization *and* continue in business outside of the reorganization process of Chapter 11.

Even if the Debtor were to propose—and obtain confirmation of—a plan of reorganization that paid absolutely *nothing* to the unsecured creditors, it still could not meet the minimum funding requirements for the Retirement Plans and continue in business. If it paid nothing to the unsecured creditors, the Debtor would save $1 million a year. That savings would still leave the Debtor approximately $2.2 million short of its minimum funding requirements for the Plans over the next three years, assuming that it devoted *all* available free cash flow to payment of the pension plan contributions.

What has been said about the Debtor's inability to obtain financing unless the Plans are terminated holds equally true for any potential sale of the business as a going concern. It is simply not plausible to believe that any prospective buyer would be willing to purchase a small company like the Debtor with the immediate prospect of having to pay a $20.7 million pension plan contribution in the first three or four years of operation. Sale of the business is as unlikely as refinancing so long as the Retirement Plans are in existence.

Therefore, on the basis of the evidence, the Court is convinced that the Debtor in this case cannot pay all of its debts under a plan of reorganization *and* continue in business, and that court approval of the termination of the Debtor's Retirement Plans is appropriate, as provided in 29 U.S.C. § 1341(c)(2)(B)(ii).

■ This conclusion is bolstered by the fact that the termination of the Retirement Plans is supported by Locals 5783 and 1303 of the United Steelworkers of America, the two unions that represent the Debtor's organized employees, and by the Creditors' Committee. This is not the first Motion filed by the Debtor affecting the Unions and their members. In July 2002, the Debtor filed Motions to reject its Collective Bargaining Agreements with Local 5783 and Local 1303. After a hearing, the Debtor and the Unions reached an agreement for the restructuring of the Collective Bargaining Agreements. Then, in September 2002, the Debtor filed a Motion to freeze the accrual of benefits under the Retirement Plans, and the Court subsequently entered an Order granting that Motion (which was unopposed), thereby authorizing the Debtor to cease all further benefit accruals under the Retirement Plans as of October 15, 2002. In anticipation of terminating the Retirement Plans, the company has agreed with the Unions to establish a Steelworkers Pension Trust and to implement a new 401(k) plan under which the Debtor will match to a certain extent the contributions of employees. As a result of these efforts, the Debtor has effected present and future savings of millions of dollars in its operations. Much to their credit, the Unions and their members have made very significant and substantial concessions to enable the Debtor to reorganize and continue in business, and the Court places great weight on the fact that the Unions do not oppose the Debtor's Motion to terminate the Retirement Plans.

Likewise, the Court places considerable weight on the fact that the Creditors' Committee has supported the Motion, despite the impact that termination of the Plans will have on the general unsecured

creditors. As previously noted, the "termination shortfall" for the three retirement plans could range from $6.3 million to $37 million, depending on the discount rate that is applied. In its draft plan of reorganization, the Debtor has chosen to use an estimate of $8 million for the general unsecured portion of the termination shortfall. Placing an additional $8 million of debt in the general unsecured creditor class will increase the total unsecured debt to approximately $23 million and will substantially dilute the potential dividends to the general unsecured trade creditors. Nevertheless, counsel for the Creditors' Committee advised the Court at the conclusion of the hearing that the unsecured creditors recognize that the reorganization process cannot go forward without termination of the Retirement Plans, and that the only reasonable alternative would be liquidation, in which case the unsecured creditors would likely receive nothing.[11]

Therefore, for the foregoing reasons, it is

**ORDERED** that the Debtor's Motion for Approval of Distress Termination (Document # 277) be and is hereby GRANTED, and the Debtor may proceed with termination of the three retirement plans at issue effective on December 31, 2002, pursuant to the guidelines and criteria of the Pension Benefit Guaranty Corporation.

---

**11.** It is not necessary for the Court to address at this time whether the PBGC's claims in this case are to be treated as general unsecured claims or as administrative claims, or whether they are to have priority status. Although the Debtor addressed those matters in its pretrial brief, those are issues to be determined on another day.