### In re US AIRWAYS GROUP, INC., et al., Debtors.

### No. 02–83984–SSM.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 7, 2003.

John Wm. Butler, Jr., Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for debtors in possession.

Lawrence E. Rifken, McGuire Woods, LLP, McLean, VA, Local Counsel for debtors in possession.

Scott L. Hazan, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Official Committee of Unsecured Creditors.

Malcolm M. Mitchell, Jr., Vorys, Sater, Seymour & Pease, L.L.P., Alexandria, VA, Local Counsel for Official Committee of Unsecured Creditors.

Dennis J. Early, Alexandria, VA, Office of the U.S. Trustee.

Richard M. Seltzer, Cohen, Weiss and Simon LLP, New York City, for Air Line Pilots Association, International.

Brian F. Kenney, Miles & Stockbridge, P.C., McLean, VA, Local Counsel for Air Line Pilots Association, International.

Sherwin S. Kaplan, Thelen Reid & Priest, LLP, for Retired Pilots Association of US Airways ("Soaring Eagles").

Harvey A. Levin, Birch, Horton, Bittner and Cherot, Washington, DC, Local Counsel for Retired Pilots Association of US Airways ("Soaring Eagles").

William Daniel Sullivan, Howrey, Simon, Arnold & White, LLP, Washington, DC, for Piedmont Silver Eagles, Capt. Paul Snell, and Capt. Dan Bowen.

Harvey M. Katz, Brown, Rudnick, Berlack, Israels LLP, New York City, for Lump Sum Eligible Pilots.

Edward Rosenthal, Rich, Greenberg, Rosenthal & Costle, LLP, Alexandria, VA, Local Counsel for Lump Sum Eligible Pilots.

Michael F. Ruggio, Duane Morris, LLP, Washington, DC, for Elwood F. Menear, Edward Graf, et al.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

A hearing was held in open court on February 21, February 24, February 28, and March 1, 2003, on the debtors' motion for a determination that they satisfy the financial requirements for a "distress" termination of the retirement income plan for pilots of U.S. Airways, Inc. The motion also seeks approval of the termination, a finding that termination would not violate the terms of the collective bargaining agreement between the debtors and the pilots' union, and approval of a follow-on defined contribution retirement plan for the pilots.

The motion is supported by the Official Committee of Unsecured Creditors but opposed by the Air Line Pilots Association ("ALPA")—the union bargaining representative for the debtors' pilots—as well as by the Retired Pilots Association of U.S. Airways ("the Soaring Eagles"), the Piedmont Silver Eagles, eighteen pilots known as the Lump Sum Eligible Pilots, another group of pilots led by Elwood Menear and Edward Graf, and by approximately 49 *pro se* active and retired pilots, at least one widow of a pilot, and at least one former spouse of a pilot. The Pension Benefit Guaranty Corporation ("PBGC")—which would be responsible for paying insured benefits under the terminated plan—filed a response taking no position on whether the plan should be terminated but urging the court to require appropriate proof and to make adequate findings.

At the conclusion of the hearing, the court made findings orally on the record and ruled that the debtors satisfied the requirements for a distress termination and would be allowed to terminate the plan, subject to a determination that doing so would not violate the collective bargaining agreement between the debtors and ALPA. That issue, the court ruled, would have to be resolved under the arbitration mechanism established by the collective bargaining agreement itself. An order reflecting the court's ruling was entered on March 2, 2003. The purpose of this opinion is to supplement the oral findings of fact and to explain in somewhat more detail, particularly for parties who were not present at the hearing, the reasons for the court's ruling.

*Findings of Fact and Procedural Background*

US Airways is the seventh largest air passenger carrier in the United States, and the largest east of the Mississippi River. Its parent holding company, U.S. Airways Group, Inc., and seven subsidiaries—among them U.S. Airways, Inc., Allegheny Airlines, Inc., Piedmont Airlines, Inc., and PSA Airlines, Inc.[1]—filed voluntary petitions in this court on August 11, 2002, for reorganization under chapter 11 of the Bankruptcy Code. Since that date, they have continued to operate their business as debtors in possession. A joint plan of reorganization has been proposed and has been submitted to creditors for a vote. A hearing on plan confirmation is scheduled for March 18, 2003.

The pilots of U.S. Airways are represented by ALPA. U.S. Airways and ALPA are parties to a collective bargaining agreement that became effective on January 1, 1998. The collective bargaining agreement requires U.S. Airways to maintain for its pilots a defined benefit retirement plan with certain specified benefits. The plan has two components—a tax-qualified plan and a non-qualified or so-called "Top Hat" plan. By law, pilots are required to retire at age 60. The amount of the pension is calculated based on age, years of service, and final average earnings. Pilots who retire at age 60 may elect a lump-sum payment. There is also an option for joint and survivor benefits.

As a result of financial distress that predated, but was exacerbated by, the terrorist attacks of September 11, 2001 ("9/11"), U.S. Airways brought in new management in March 2002 and began efforts to restructure its operations. As part of that effort, it negotiated with its unions, including ALPA, for wage and other concessions that would make the airline more competitive. An agreement was reached with ALPA ("the first-round concessions") approximately a month prior to the chapter 11 filing. None of these concessions modified the terms of the pilots' pension plan, although the salary reductions did have the incidental effect of somewhat reducing the future obligations under the plan. As part of the agreement, the debtor agreed, if it were to file for chapter 11, not to seek relief from the collective bargaining agreement under §§ 1113 or 1114, Bankruptcy Code.

Prior to the chapter 11 filing, U.S. Airways submitted an application to the Air Transportation Stabilization Board ("ATSB") for a $900 million guarantee with respect to a proposed $1 billion loan. This approval was based on a 7–year business plan which required the debtor to achieve certain targeted reductions in operating costs. Tentative approval of the guarantee was given prior to the chapter 11 filing. Although U.S. Airways had initially hoped to effect its restructuring outside of chapter 11, it ultimately determined that it could not reach all necessary agreements without filing for chapter 11, which, as noted, occurred on August 11, 2002.

Since the outset of the case, the debtors have aggressively pursued a "fast track" reorganization, with the announced goal of being out of chapter 11 by the end of first-quarter 2003. They achieved substantial "first-round" concessions from those unions with which they had not reached agreement prior to the chapter 11 filing, have saved large sums by abandoning unneeded aircraft, and have negotiated substantial reductions in payments on aircraft

---

1. Allegheny, Piedmont, and PSA operate short-haul turboprop aircraft under the name U.S. Airways Express.

they have kept. To maintain cash liquidity during the reorganization process, the debtors, with court approval, entered into a $500 million post-petition credit facility ("the DIP loan") with the Retirement Systems of Alabama ("RSA"). Of this amount $300 million has already been drawn down. RSA is also the "plan sponsor" under an agreement whereby it will invest $240 million at confirmation in exchange for a 37% interest in the reorganized debtors. Finally, RSA has agreed to loan $75 million of the non-guaranteed (or "at risk") portion of the $1 billion ATSB loan.

Despite the debtors' efforts, the path to profitability and emergence from chapter 11 has not been smooth. In particular, in the October to November 2002 time frame, two serious problems surfaced that threatened the debtor's business plan, which in turn was the foundation for the ATSB loan guarantee and a predicate for the RSA investment. The first was a dramatic shortfall in revenue, as airline passenger revenues throughout the industry remained substantially below pre–9/11 levels. As a result, the revised revenue projections for 2003—the year of the planned emergence from chapter 11—were $997 million below the original projections. Coupled with an increase of $51 million in fuel costs, this left the debtors with a projected pre-tax loss for 2003 of over $800 million instead of the modest $122 million profit that was projected in the business plan.

The second problem that emerged was a serious funding shortfall for the debtors' defined benefit pension plan over the 7–year period of the business plan. The debtor maintained four defined benefit plans, among them the ALPA plan. Two factors conspired to create the funding shortfall. First, protracted poor performance by the stock market had resulted in a significant decline in the value of the plan assets. Second, the decline in long-term interest rates to a 40–year historic low had increased the amount of the current liabilities for the plans, since current liabilities are determined based on the cost of an annuity to pay the specified benefit, and that cost, in turn, rises as long-term interest rates fall.

The debtors responded to the revenue shortfall by seeking additional savings from its labor force, its aircraft lenders and lessors, and its vendors. The negotiations with its unions, including ALPA, for a "second-round" of concessions took place in early December 2002, as the debtors struggled to meet their goal of filing a plan of reorganization by December 20, 2002. The concessions by ALPA—which was the only labor group to agree to the full amount requested by the company—totaled $179 million, of which $101 million represented primarily work-rule changes and wage reductions, and $78 million represented modifications to the accrual formula for the pension plan. The concessions were embodied in two documents referred to as Letter of Agreement ("LOA") 83 and LOA 84.

At the time these negotiations were taking place, the debtors were also attempting to find a solution for the funding shortfall in its defined benefit retirement plans. As projected by the plans' actuaries, the required contributions over the seven years of the ATSB loan and the business plan were as follows:

| Year | All 4 Plans | Pilots Plan |
|------|-------------|-------------|
| 2003 | $ 51 million | $ 51 million |
| 2004 | $753 million | $525 million |
| 2005 | $538 million | $337 million |
| 2006 | $425 million | $275 million |
| 2007 | $346 million | $222 million |
| 2008 | $246 million | $175 million |
| 2009 | $ 93 million | $ 74 million |
| Total | $2.453 billion | $1.659 billion |

One solution investigated by the debtors involved "restoration funding," under

which, as the debtors viewed the law, the PBGC could approve a 30–year amortization of the funding shortfall. For the pilots' plan, restoration funding would require the debtor to pay approximately $122 million per year, or $854 million over the seven years of the business plan, instead of the $1.659 billion that would be required without such relief. The other solution contemplated waivers by the Internal Revenue Service ("IRS") of the funding contributions that would have been required in 2004 and subsequent years. Looming over all of this was the realization that the PBGC could involuntarily terminate the plans because of their under-funded state.

As a condition of agreeing to the second round of concessions, the ALPA negotiating committee demanded a letter from U.S. Airways to ensure that, if the pension plan were terminated, U.S. Airways would not simply pocket the money it was otherwise obligated to pay into the plan. This letter ("the side letter"), which is undated—and for that matter, unsigned—was delivered to the negotiating committee on December 13, 2003. It stated in relevant part:

> If the PBGC and the IRS reject the Company's request for long-term funding relief and this results in termination of the plan, the freezing of the plan or significant modification in Plan benefits from those negotiated in the 2002 Supplementary Cost Reduction Agreement ("Agency Action"), the parties agree to meet and confer for the purpose of negotiating alternate pilot retirement benefits.

> If the Plan is terminated, the alternate pilot retirement plan shall provide benefits from and after the effective date of the termination that resemble, in the aggregate, the benefits pilots would have earned ... absent the termination....

The letter limited the company's commitment with respect to the follow-up plan by stating that such a plan "may" take the form of a defined contribution plan and that the company's "cash cost ... may in no event exceed [the] restoration funding cost in any year." The cost that the debtors had projected in their business plan for restoration funding of the pilots pension plan was $122 million per year. The chairman of the ALPA negotiating committee testified that the reference in the side letter to plan "termination" was intended to address the possibility of an involuntary termination by the PBGC and was not intended by ALPA as consent for the debtors to initiate a distress termination. Indeed, ALPA has filed a grievance under the collective bargaining agreement asserting that the debtors' notice of intent to terminate the plan violates the terms of the agreement.

By its terms, the side letter was to be kept confidential until "Agency Action" had occurred. The debtors and representatives from ALPA had met with the PBGC on November 22, 2002, to discuss the restoration funding approach. Around December 11, 2002, the debtors received a copy of a legal memorandum from PBGC's general counsel opining that restoration funding could not be approved. The debtors then submitted a legal memorandum to the PBGC taking issue with that analysis. The debtors and representatives of ALPA met with the IRS on December 13, 2002, but received no encouragement that a waiver solution would be available. Finally, the debtors and ALPA approached friendly senators from states in which U.S. Airways had a presence and managed to have a bill introduced in Congress that would have provided U.S. Airways with funding relief equivalent to what it would have achieved from restoration funding.

That legislation was defeated in committee on January 9, 2003. A hearing was held on January 14, 2003, at which representatives of ALPA and the debtor testified in favor of a legislative solution. However, an attempt on the Senate floor to incorporate the relief as an amendment to a continuing resolution was defeated on January 22, 2003. Eight days later—January 30, 2003—the debtors gave the PBGC and the ALPA plan participants 60 days notice that the debtors intended to terminate the pilots defined benefit plan on March 31, 2003.

Simultaneously with the giving of the notice, the debtors filed the present motion and noticed it for hearing on February 20, 2003. Because of other matters being heard that day, the hearing—which extended over a period of four full days—did not commence until February 21, 2003. At the hearing, the debtors presented evidence that their business plan—which is the basis of the ATSB loan guarantee approval and a predicate for the RSA investment—is based on "an assumed 30–year amortization of unfunded pension liability." For the pilots' plan, such restoration funding would cost the company approximately $805 million less over the seven years of the business plan than the projected funding requirement in the absence of restoration funding. Relevant features of the business plan may be summarized as follows: [2]

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Revenue | $7,133 | $8,112 | $8,702 | $9,193 | $9,414 | $9,501 | $9,586 |
| Pre-tax Income | $ (229) | $ 122 | $ 363 | $ 571 | $ 625 | $ 593 | $ 587 |
| Ending cash | $1,046 | $1,288 | $1,647 | $1,894 | $2,042 | $1,994 | $1,920 |

The debtor's chief financial officer testified that within the airline industry, cash reserves equal to approximately 20% of revenues would be necessary for the debtor to be viewed as financially healthy, and that absent appropriate levels of cash, the company could not obtain the financing necessary to implement its long-term business strategy of shifting to the use of regional jets on routes that are currently unprofitable. He further testified that in the absence either of restoration funding or the ability to terminate the pilots' pension plan the additional amounts due in 2004 and 2005 to maintain the current plan would reduce the debtor's projected cash below acceptable levels. As noted, the required contributions for those two years, as calculated by the plan's actuaries, would total $862 million, or approximately $618 million more than the amount that would be required under the $122 million a year for restoration funding. The debtors' financial advisor testified that without a "resolution" of the pension funding issue that will enable the reorganized debtors to meet the projections in their business plan, the ATSB is unlikely to issue its guarantee and RSA is unlikely to make its investment. Indeed, the ATSB, in a letter dated February 11, 2003, while approving the $900 million guarantee (based on a finding that the debtor's revised business plan was financially sound and presented a reasonable assurance of repayment of the proposed loan) made its approval subject to a number of conditions, among them that "[a] resolution of the Applicant's pending funding issue must be approved by the PBCG and, if necessary, the Bankruptcy Court." The letter goes on to state

The Board understands that discussions involving the applicant's pension initia-

**2.** Figures are in millions of dollars.

tive are ongoing among the Applicant and other interested parties. The Board takes no position on the form or specific provisions of such a resolution. The debtors' business plan is dependent upon the $1.240 billion in exit financing represented by the ASTB guarantee and the RSA investment. The debtors have explored other sources of exit financing but have been unable to identify any other lender or investor willing to provide the cash needed for the debtor to emerge from chapter 11.

Consistent with the commitment in the side-letter to establish a follow-up pension plan, the debtors have proposed, subject to negotiations with ALPA as to the final terms, a defined contribution retirement plan for the active pilots. This plan would provide no benefits to pilots already retired. The preliminary design by the debtors embodies individualized contribution levels based on the number of years each pilot has remaining before reaching retirement age. Those with fewer years remaining would receive significantly higher contributions—in a few cases up to 50% of their pay—in an effort to build up the account to the point where the retirement benefit, coupled with what the pilot would receive from the PBGC would approach what the pilot would have received under the defined benefit plan.

The maximum insured benefit currently being paid by the PBGC for a person retiring at age 60—the mandatory retirement age for pilots—is $28,614.00 per year. Depending on when they first became eligible to retire, however, some pilots could receive more, since funds in a terminated retirement plan are used first to pay benefits to "Class 3" participants. The debtors' actuary estimated that the plan was sufficiently funded to pay approximately 90% of the contractual benefit to Class 3 participants. However, individual cases—as reflected on an exhibit introduced at the hearing—appeared to vary widely, with the projected payments for many of the retired pilots being in the range of one-third to one-half of the amount they would receive under the plan. In one case, for example, a retiree due to receive $211,871 annually would receive only $68,775. Retirees not falling within Class 3 would receive only the insured amount. For a number of the active pilots, even the additional benefit from the proposed follow-on plan would result in a projected benefit of only approximately 50% of the benefit that would be paid under the current plan, and even then, only if the follow-on plan achieves the projected 8% rate of return.

A considerable amount of testimony, both on direct and cross-examination, concerned the assumptions utilized by the plan's actuary, as well as the savings that could be achieved if various alternative strategies were pursued. One major issue was the proper discount rate to be used for evaluating plan liabilities for years after 2003. The plan's actuary assumed that certain short-term relief enacted by Congress for years 2002 and 2003 would not be extended when the legislation sunsets at the end of 2003. The relief centers on the discount rate used to calculate future liabilities. As noted, the lower that rate, the higher the liability. The discount rate in effect before the current relief was 105% of the 4–year weighted average for 30–year Treasury notes, the yields for which are now at a historic low. Thirty-year Treasury notes are no longer being issued, but apparently the IRS calculates a surrogate for that rate based on yields of existing notes. Under the current relief legislation, the discount rate for current liabilities is calculated at 120% rather than 105% of the 4–year weighted average for 30–year Treasury notes. This has the ef-

fect—because it increases the discount rate—of reducing current liabilities, and thus the required contributions the debtors would have to be met. The debtor's actuary testified that he prepared analyses showing the funding contributions that would be required both if legislation were enacted extending the current relief through the seven years of the business plan and if it were not. The debtor's management determined to adopt the more conservative assumption. One of the actuaries testifying as an expert for the retirees stated that he would advise a client of the results under both scenarios and let the client decide which to adopt. The other actuary who testified for the retirees stated that he was certain—and, indeed, could "guarantee"—that Congress would enact legislation extending the 120% standard, or something like it, through the out years of the debtor's business plan. The actuaries differed on the actual effect if the current legislation were extended through the remaining years of the business plan. The retirees' actuaries based their calculations on rules of thumb and rough estimates, while the plan's actuary based his on the actual computer model used for administration of the plan. For that reason, the court finds the calculations of the plan's actuary more credible. Extension of the current funding relief would result a savings of $115.9 million in the amount due over the seven years of the business plan as compared with the amounts due if the current relief expires on its sunset date: [3]

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
|------|------|------|------|------|------|------|------|-------|
| Reversion | $25.5 | $532.0 | $331.6 | $268.7 | $216.0 | $169.5 | $ 68.5 | $1,611.8 |
| Extension | $25.5 | $448.5 | $259.5 | $254.0 | $220.0 | $175.8 | $112.6 | $1,495.9 |
| Savings | $ - | $ 83.5 | $ 72.1 | $ 14.7 | $ (4.0) | $ (6.3) | $(44.1) | $ 115.9 |

Other issues explored on examination and cross-examination of the actuaries concerned the financial effect of "freezing" the pilots plan, freezing all of the defined benefit plans, and freezing all of the retirement plans (both defined benefit and defined contribution); of retroactively reducing benefits under the various plans; and of splitting the pilots' plan into two plans, one for the retirees and one for the active pilots. Estimates of the amount that could be saved by various combinations of these approaches ranged up to $1.5 billion dollars. The proportion of the pilots' plan that represents obligations owed the retirees, as opposed to the active duty pilots, was estimated to be approximately 25%.

The First Amended Joint Plan of Reorganization filed by the debtors incorporates the revised business plan that was provided to the ATSB in support of the application for the loan guarantee. Under the plan, existing shareholder interests are cancelled, and shareholders receive nothing on account of their equity interest. Unsecured creditors will receive newly issued stock having an estimated value equal to less than two cents on the dollar. A large block of stock will go to the RSA in exchange for its $240 million investment. Other shares will be issued to the various labor groups in exchange for their wage concessions. The plan's financial projections are based on the RSA investment as well as the $1 billion loan ($900 million guaranteed by the ATSB and $100 million "at risk") to be made at confirmation.

---

**3.** Figures are in millions of dollars and reflect only the tax-qualified component of the pilots' plan.

*Conclusions of Law and Discussion*

### A.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. Under 28 U.S.C. § 157(b)(2)(A), this is a core proceeding in which a final order may be entered by a bankruptcy judge. Proper notice of the motion and of the hearing were given to the PBGC, ALPA, and all beneficiaries of the pilots' plan. Vigorous objection was raised· by many of the objecting parties that 20 days notice, even if technically sufficient under the Federal Rules of Bankruptcy Procedure and the case management order entered in this case, was wholly inadequate as a practical matter, given the complexity of the financial issues. The court was not unsympathetic to that argument but concluded that the circumstances simply did not permit the hearing to be put off and required that the motion be promptly decided. In any event, the record reflects that the objecting parties, notwithstanding their limited opportunity to prepare, were fully able to develop the record and present their cases.

### B.

The pilots retirement plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which, among other things, establishes certain funding standards for defined benefit plans and provides an insurance program under which the PBGC will administer an underfunded pension plan that is terminated. Termination of such a plan by the employer is governed by 29 U.S.C. § 1341, which addresses both a "standard" termination and a "distress" termination. It is the latter which the debtors seek to accomplish.

In order to effect a distress termination, the plan administrator must give the PBGC and each affected party at least 60 days written notice of intent to terminate setting forth the proposed termination date. 29 U.S.C. § 1341(a)(2). Additionally, the termination must not violate the terms and conditions of an existing collective bargaining agreement. 29 U.S.C. § 1341(a)(3). For a chapter 11 debtor, the standards for a distress termination require that four condition be met:

1. As of the proposed termination date, the employer has filed, or has had filed against it, a petition for reorganization under the Bankruptcy Code;
2. The case has not, as of the proposed termination date, been dismissed;
3. The employer has provided the PBGC any request for Bankruptcy Court approval of the termination; and
4. The bankruptcy court determines that, unless the plan is terminated, the employer will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and the court approves the termination.

29 U.S.C. § 1341(c)(2)(B)(ii)(I)–(IV). The statute requires the debtor to make a showing that it will be unable to pay all of its debts under a plan of reorganization and will be unable to continue in business outside of bankruptcy. *In re Wire Rope Corp. of America, Inc.*, 287 B.R. 771, 777 (Bankr.W.D.Mo.2002). The purpose of the statute

is to limit "to cases of severe business hardship" the ability of plan sponsors to terminate their pension plans and thereby shift liability for guaranteed benefits onto other insurance premium payers in the PBGC program.

*Id.* The reference in the statute to "a" plan of reorganization does not permit a dis-

tress termination simply because a particular plan requires it; rather the test is whether the debtor can obtain confirmation of *any* plan of reorganization without termination of the retirement plan. 287 B.R. at 777–78. The burden of proof for a distress termination is on the sponsor of the plan. 287 B.R. at 777.

The debtors assert that, absent termination of the plan, they will be unable to obtain confirmation of the reorganization plan they have proposed. They also assert that the December 13, 2002, side letter constituted an assent by ALPA to a distress termination if pension funding relief could not be obtained from the PBGC and ALPA, and they seek a ruling that a distress termination would not violate the collective bargaining agreement. Finally, they seek authority to enter into a follow-on defined contribution plan for the pilots on terms consistent with those set forth in the side letter.

The objecting parties contend that the debtors have simply not made an adequate showing that reasonable alternatives to plan termination have been properly considered or explored. They also dispute that the funding shortfall is as great or as unmanageable as the debtors have portrayed. They argue that plan termination would have a devastating effect on the pilots in general, especially on the retirees (who would receive no benefits from the follow-on plan), and is highly unfair given that only the pilots' plan would be terminated, while all the remaining employee groups would keep their current pension benefits. Finally, they argue that ALPA never consented to a distress termination of the plan; that termination would violate the collective bargaining agreement; that in any event under the Railway Labor Act this court has no jurisdiction to make that determination; and that the court should not even consider approving the termi-

nation until the pending grievances are resolved.

## C.

■ The pivotal issue to be resolved by the court is whether the financial requirements for a distress termination have been met. As the court observed in ruling from the bench, the very fact that this issue is before the court is disheartening, to say the least. At the outset of this chapter 11 case, the debtors announced that they intended to pursue a "labor-friendly" reorganization. There is no dispute that the pilots have already given up more in pay and benefits than any other employee group. This is true not only in gross dollar terms but also as a percentage of the targets that each group was asked to give. Under the present motion, the only pension plan that would be terminated is the pilots' defined benefit plan. It is not surprising, therefore, that the pilots, whether active or retired, feel a particularly keen sense of having been shabbily treated.

The problem, however, is simply the magnitude of the funding obligation for the pilots' plan, which dwarfs that of the other plans. As noted, the funding requirement for the pilots' plan over the seven years of the business plan is fully two-thirds of the amount for all four of the company's defined benefit plans (one of which has been "frozen" since 1991) combined. In simple dollar terms, terminating any of the other defined benefit plans would not solve the cash flow obstacles to the debtors' reorganization.

The statutory test, as noted, is whether "unless the plan is terminated, the employer will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process." 29 U.S.C. § 1341(c)(2)(B)(ii)(IV). The only

plan of reorganization that has been identified as being in any sense realistic is the plan proposed by the debtor and approved by the ATSB. It "pays" unsecured creditors only in stock having an estimated value of less than two cents on the dollar. The Official Committee of Unsecured Creditors has nevertheless recommended acceptance of the plan. Even this marginal payout is wholly dependent upon the debtors' obtaining the $1.240 billion in exit financing represented by the $1 billion ATSB-guaranteed loan and the $240 million RSA investment. The testimony of the debtors' financial advisor is that without a "resolution" of the pension funding issue that will enable the reorganized debtors to meet the projections in their business plan, the ATSB is unlikely to issue its guarantee and RSA is unlikely to make its investment. The debtors have explored other sources of exit financing and but have been unable to identify any other lender or investor willing to provide the cash needed for the debtor to emerge from chapter 11. Indeed, without the ability to draw down on the remaining $200 million in DIP financing, it is questionable whether the debtor can continue to operate in chapter 11. No "resolution" of the pension funding issue has been identified by the debtors other than restoration funding or termination of the pilots' plan. Restoration funding is wholly dependent upon Congress enacting legislation to provide such relief, and no such legislation is currently pending. That leaves only termination.

The objecting parties assert, however, that there are other solutions, or at least potential solutions, which the debtors have failed adequately to explore. These include "freezing" the pilots' plan, splitting the pilots' plan into separate plans for retirees and active pilots, freezing the company's other pension plans, and retroactively reducing the benefits under the company's other pension plans. Based on the evidence presented at the hearing, however, the court was not convinced that any of these alternatives were realistic, especially given that modifications to the various plans, whether defined benefit or defined contribution, for the debtor's other labor groups would require either the agreement of the unions involved or the rejection of the collective bargaining agreements with those unions. As reflected by the debtors' limited success in obtaining second-round concessions from the unions other than ALPA, the likelihood that, for example, the mechanics and the flight attendants—whose pay and pensions are far below that of the pilots—would agree to a freezing or retroactive reduction in their pension benefits so as to preserve the pilots' benefits verges on fantasy. Moreover, time is running out. It was testified that the debtors' agreement with their Visa/Mastercard credit card processor expires March 31, 2003, and apparently will not be extended in any event beyond May 1, 2003. Approximately half the debtors' ticket revenues come from Visa and Mastercard sales. Although the debtors have negotiated with other credit card processors to take the existing processor's place, those processors have stated that emergence from chapter 11 is a condition of entering into any agreement.

The court determines, therefore, that the debtors have carried their burden of showing that, unless the pilots' pension plan is terminated, the debtors will not be able to pay their debts under a plan of reorganization and will not be able to continue in business outside the chapter 11 reorganization process. Only one realistic plan of reorganization has been proposed. It is dependent on the $1.240 billion in exit financing represented by the ATSB $900 million loan guarantee, the associated $100 million in "at risk" loans, and the RSA

$240 million capital contribution. Those in turn are dependent on the debtor's ability—and more precisely on ATSB's and RSA's comfort that the debtors have the ability—to meet in each year the levels of profitability reflected in the seven-year business plan. No other source of exit financing has been identified, and without the ATSB guarantee and the RSA investment, there is no apparent way the debtor will be able to emerge from chapter 11 and avoid liquidating under chapter 7.

### D.

■ The next issue is whether the court should "approve" the termination. No reported case appears to have discussed what showing, if any, must be made for approval beyond a finding that the debtor meets the financial requirements set forth in the statute. The court nevertheless will assume that the court, in deciding whether to approve a distress termination, may consider other equities in the case.

As will be discussed, there remains an issue of whether termination of the pilots' pension plan would violate the terms of the collective bargaining agreement between ALPA and the debtors. However, again for reasons that will be discussed, this court does not have jurisdiction to decide that issue. Accordingly any approval by this court is necessarily subject to a separate determination that termination will not violate the collective bargaining agreement.

The remaining argument is that termination of the pension plan result in serious financial hardship to many, and perhaps most, of the active and retired pilots and their families. From the evidence presented as well as the numerous letters the court has received, it is obvious that many individuals will indeed suffer great financial hardship. But the question always remains: what is the alternative? If the debtors are unable to reorganize and must liquidate in chapter 7, the pension plan would be terminated anyway, and the retired pilots would be in exactly the same position, as regards their pension, as they will under the proposed distress termination. The position of the active pilots would be significantly worse under a liquidation, because they would also lose their current employment and whatever benefits might accrue under a follow-on plan. Given that reality, the undoubted financial hardship that will result from a termination of the plan is an insufficient basis for this court to withhold its approval when the debtors have made a compelling showing that termination is necessary for this airline to emerge from chapter 11.

### E.

■ The final issue is whether a distress termination of the plan would violate the collective bargaining agreement between the debtors and ALPA. There is no dispute that the maintenance of the plan is required by the collective bargaining agreement, which has not been rejected and indeed which the chapter 11 plan proposes to assume. The debtors, however, contend that the December 13, 2002, side letter which was demanded by ALPA as a condition of agreeing to the second round of concessions constitutes ALPA's consent to a distress termination if the debtors and ALPA were unsuccessful in obtaining funding relief from the PBGC or the IRS. ALPA, on the other hand, asserts that it never agreed to such a termination by the debtors but simply recognized that the PBGC was not bound by the collective bargaining agreement and had the power to step in and terminate the plan. The purpose of the letter, according to ALPA's evidence, was simply to provide a measure of protection in the event the PBGC acted on its own initiative.

The language in the side letter could fairly be characterized as equivocal. It begins, "If the PBGC and the IRS reject the Company's request for long-term funding relief *and this results in termination* of the plan...." (Emphasis added). Standing alone, "termination" might refer either to a distress termination or an involuntary termination. At the same time, the phrase "and this results" strongly tends to suggest outside action rather than action by the company. It is true that some of the testimony given by the president of ALPA at the Congressional hearing in January 2003 could be interpreted as acknowledging the debtors' right to initiate a distress termination if agency or legislative relief were not obtained. Balanced against this, however, is the testimony of the head of the pilots negotiating committee that the side letter was not intended to allow the debtors, as opposed to the PBGC, to terminate the plan without ALPA's approval. Indeed, given that ALPA had already, as part of the second round of concessions, agreed to very specific changes in the pension plan, it would seem strange that the union would, in a side agreement, essentially give the debtor carte blanche to go ahead and terminate the plan. In any event, having considered the evidence, the court can only conclude that reasonable finders of fact could reach differing conclusions as to the meaning of the side letter, and, specifically, as to whether it authorized the debtors to proceed with a distress termination of the plan.

It is precisely because reasonable persons could disagree as to the interpretation of the side letter that the court declines to reach that issue. As ALPA persuasively argues, the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* which also governs collective bargaining agreements in the airline industry, *see* 45 U.S.C. § 181, divests federal courts of jurisdiction over so-called "minor" disputes as to the interpretation and application of collective bargaining agreements,[4] which instead must be determined by boards of adjustment established under the agreement itself. 45 U.S.C. § 184; *United Transp. Union v. South Carolina Pub. Ry. Comm'n,* 130 F.3d 627 (4th Cir.1997) (citing *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n.,* 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989)); *Air Line Pilots Ass'n, Intern. v. Northwest Airlines, Inc.,* 627 F.2d 272 (D.C.Cir.1980) (district court lacked subject matter jurisdiction over dispute between airline and union as to alleged violation of collectively bargained pension plan). This is true even as to an airline in bankruptcy. *In re Continental Airlines,* 125 F.3d 120, 129 (3rd Cir.1997) (role of federal court is to protect the jurisdiction of the arbitral board; court cannot inquire into the merits of the underlying dispute under the collective bargaining agreement); *see also In re Ionosphere Clubs, Inc.,* 922 F.2d 984 (2d Cir. 1990) (debtor is bound by the arbitration provisions of the collective bargaining agreement until the agreement is rejected under § 1113, Bankruptcy Code).

Here, there is no dispute that a system board of adjustment has been established under the collective bargaining agreement between the debtor and ALPA to resolve

---

4. As the Fourth Circuit has explained, "minor" disputes under the Railway Labor Act "involve 'either ... the meaning or proper application of a particular provision [of a collective agreement] with reference to a specific situation or to an omitted case....'" *Dement v. Richmond, Fredericksburg & Potomac R.R. Co.,* 845 F.2d 451, 462 (4th Cir. 1988) (*citing Elgin, J & E. Ry. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)).

disputes under the agreement. The court will assume that it has discretion, in matters falling within its "core" jurisdiction, to determine whether to stay its own proceedings in favor of arbitration. *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495 (5th Cir.2002); *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2nd Cir.1999). However, in a case in which a fair argument can be made for each party's interpretation of the agreement, the court concludes that the firm and long-standing policy under the Railway Labor Act of deferring to the arbitration mechanisms established by the Act precludes this court from reaching the merits of the dispute. For that reason, the court declines to make a finding, as the debtors have requested, that a distress termination would not violate the terms of the collective bargaining agreement. Any such ruling must be made by the System Board of Adjustment established under the collective bargaining agreement.

### F.

One final matter requires only brief discussion. ALPA and several of the individual objectors assert that the debtors are attempting to have this court "impose" a particular form of defined contribution plan upon the pilots. The debtors have disclaimed any intent to have this court decree the details of a follow-up plan (assuming the present plan is terminated) or to impose it on the pilots. The debtors say they simply seek authorization from the court to enter into a follow-up plan on such terms, consistent with the December 13, 2002, side letter, as may be negotiated with ALPA. That is the court's understanding of the motion as well. Granting the debtors authority to enter into a defined contribution plan for the pilots does not compel the pilots to accept any particular form of plan and does not allow the debtor to impose particular plan terms on the pilots. It simply eliminates the need for the debtor to return to this court for approval of a follow-up plan provided the plan does not cost more than the debtor would have paid under a restoration funding approach (and is already accounted for in the financial projections supporting the plan of reorganization) and provided the plan is otherwise non-objectionable to the IRS and the PBGC.

### Conclusion

In summary, the court finds that the financial requirements for a distress termination have been met, and the court has approved such termination provided the termination does not violate the terms of the collective bargaining agreement between the debtors and ALPA. The court declines to make a ruling on that issue, and that dispute will have to be resolved under the arbitration mechanism established by the collective bargaining agreement pursuant to the Railway Labor Act. The court further concludes that the debtors should be allowed, if the existing pension plan is terminated, to enter into a follow-on defined contribution plan upon such terms as may be negotiated with ALPA without having to return to this court provided the cost of the plan does not exceed the amount the debtor would have paid under a restoration funding approach.

An order has previously been entered consistent with this opinion.