08-4173-cv
Vaughn v. Air Line Pilots Association

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: August 6, 2009                                        Decided: May 14, 2010)

Docket No. 08-4173-cv

_____

Jerry L. Vaughn, John Anderton, Stephen Lee Avery, John R. Baganz, David W. Baughman, John Beglin, David D. Bentley, Gregory B. Blair, Bryan F. Bogdan, Richard E. Bowden, Robert D. Boyd, Terry E. Brock, Tim R. Bronson, Jordan Brown, Margaret Bruce, Mark F. Butler, Jerry E. Callahan, Gene Carswell, Carl C. Chappell, Bruce B. Clark, Daryl Ray Click, Terry Lee Collette, Robert Converse, Robert D. Coons, Marshall P. Copeland, Jack R. Cosper, Mitchell Cowan, James Richard Cunningham, Michael R. Davis, Gerard M.J. Donovan, Robert W. Dowgialo, Todd Michael Edwards, James Eng, Gerard P. Fenzel, Thomas Carter Fitzpatrick, James Clyde, Paul R. Flood, Fred Freshwater, Ronald J. Gabor, Michael S. Galbraith, Michael W. Gillis, Ronald H. Gordan, Ronald F. Gorr, Richard T. Graves, James Grizzard, Donald Gunter, Robert Hale, Boyd Hunt Harris Jr., Jeffrey Charles, Hathorn, Gary M. Henderson Sr., Michael J. Hinchliffe, Dale A. Hopta, Gary K. Huss, Robert Inscoe, David H. Jacobson, David Johnson, Dennis R. Johnson, Gale Denning Johnson Jr., Walter Johnston, Sigurdur V. Kristjansson, Ira Josephson, Richard A. Kertz, Richard W. Krishock, George T. Kuhn, Philip S. Laudenslager, Robert Lee, Edward J. Leviker, Richard K. Libby, Daniel C. Littlefield, Richard Lytle, Larry L. Martin, Sidney G. Matlock, Larry D. McCarroll, Stanley W. McKee, Woody Menear, Arthur H. Middleton, William Mio, Gary Malloy, Roger L. Moore, Cindy Munn, Michael Mychalishyn, Robert B. Nairn, James R. Nash, George Neely, Jim Newark, David Ordorica, Andrew S. Orochena, Richard T. Osborne, Carlisle C. Owen, Tom N. Park Jr., William W. Patterson, Irwin Pentland, William Puckett, David Reno, Shaul Ringler, John G. Ross, John V. Sabel, Kenneth Sager, Donald Sammons, Ron Schilling, F. Theodore Schott III, Richard Scoskie, James E. Sharkey, Russell J. Shaw, Larry E. Shuck, Albert B. Smith, Doug A. Stansbury, Robert R. Starr, Chesley B. Sullenberger III, Paul M. Summerville, Richard H. Tabler, Randall H. Tomb, Tom Trebby, Daniel James Von Bargen, Steve Wadecki, James Raymond Wagner, James N Walther, Darrell W. Ward, Leonard Ware, Jerry Wayne, Floyd Bertram Wells, Robert W. Williams and Michael Wade Wright,

Plaintiffs-Appellants,

-v-

Air Line Pilots Association, International, Duane E. Woerth, as President of Air Line Pilots

Association, International, William Pollock, Michael D'Angelo, Tom Simmons, Dan Scola, Lyle Newman, Don Baier, Paul Hocking, Ray Belz, Bruce Limpitlaw, Doug Mowery, Michael Tosi, Tim Baker, Richard Moseley, Kim Snider, John Brookman, US Airways, Group, Inc., and US Airways, Inc.,

Defendants-Appellees,

Retirement Systems of Alabama and Retirement Systems of Alabama Holdings, LLC.,

Defendants.

_____

Before: POOLER, HALL, and LIVINGSTON, Circuit Judges.

Plaintiffs-Appellants, more than 100 US Airways, Inc. pilots over or approaching the age of sixty, sued the Air Line Pilots Association, International ("ALPA"), the pilots' former collective bargaining representative, for breach of the duty of fair representation. The district court (Townes, J.) dismissed plaintiffs' Fourth Amended Complaint, concluding that plaintiffs failed to show that ALPA had breached its duty of fair representation and that, for certain claims, plaintiffs failed to show causation between ALPA's actions and their injuries. Affirmed.

| | |
|---|---|
| Appearing for Appellant: | TODD E. DUFFY (James E. Atkins, Dennis J. Nolan, on the brief), Duffy & Atkins LLP, New York, NY. |
| Appearing for Appellee: | JAMES L. LINSEY (Eyad Asad, Clay Warner, on the brief) Cohen, Weiss and Simon LLP, New York, NY. |

POOLER, Circuit Judge:

Plaintiffs-Appellants, more than 100 US Airways, Inc. ("US Airways") pilots, over or approaching the age of sixty, appeal from a July 24, 2008 Memorandum and Order of District Court Judge Sandra Townes of the Eastern District of New York dismissing their Fourth Amended Complaint against Defendants-Appellees, the Air Line Pilots Association, International

("ALPA") and Duane Woerth, former president of ALPA.[1]  Vaughn v. Air Line Pilots Ass'n, Int'l, 395 B.R. 520 (Bankr. E.D.N.Y. 2008).

In this opinion, we address only plaintiffs' duty of fair representation claims, having addressed their remaining claims in a summary order issued simultaneously with this opinion. The district court dismissed all three of plaintiffs' fair representation claims, concluding that plaintiffs failed to show that ALPA had breached its duty of fair representation and that, for certain claims, plaintiffs failed to show causation between ALPA's actions and their injuries.  We now affirm.

## BACKGROUND

This case arises against the backdrop of the September 11, 2001 terrorist attacks and the subsequent financial troubles of the airline industry.  For all times relevant to this action, ALPA was the labor organization that represented US Airways pilots.[2]  Under the collective bargaining agreement in effect in 2001, US Airways maintained a defined benefit plan ("DB Plan") for the pilots that guaranteed them a certain level of pension benefits upon retirement.  Although the contributed funds were invested, and thus subject to gains and losses, each pilot's promised benefits remained constant.  Pursuant to the Employee Retirement Income Security Act ("ERISA"), the plan was required to have sufficient funding to pay 80% of promised benefits at all times.  If the plan's funding dropped below 80%, US Airways was required to make

---

[1]  Plaintiffs sue Duane Woerth in his official capacity only.

[2]  ALPA has not represented US Airways pilots since 2008, when a new internal labor union, the US Airways Pilots Association, was certified as the pilots' representative.  See In the Matter of the Representation of US Airways Pilots, Case No. R-7147, 35 N.M.B. No. 37 (Apr. 18, 2008).

contributions to bring it to the required level.

Between 1999 and 2001, the DB Plan was either over-funded or fully funded and, therefore, US Airways was not required to make any contributions. In 2002, however, US Airways reported that, because of poor stock market performance, the plan was only funded at 64%. At the same time, US Airways publicly announced that it was experiencing serious financial difficulties caused in part by the September 11 terrorist attacks.

In the spring and summer of 2002, US Airways approached ALPA's US Airways Master Executive Council ("MEC") to request substantial concessions from the pilots on wages and benefits, claiming that such concessions were necessary to stave off bankruptcy. The MEC agreed to the concessions. At the same time, US Airways obtained tentative approval of a $1 billion loan package guaranteed by the Air Transportation Stabilization Board ("ATSB"), which was conditioned on US Airways demonstrating that it could achieve certain revenue and cost reduction targets over a seven-year period. See In re US Airways Group, Inc., 296 B.R. 734, 737 (Bankr. E.D. Va. 2003).

Despite the pilots' concessions, US Airways filed for bankruptcy under Chapter 11 on August 11, 2002. Id. at 737. Seeking a "fast track" reorganization, US Airways obtained a $500 million loan from Retirement Systems of Alabama ("RSA"), which also agreed to invest $240 million in US Airways once it exited bankruptcy in exchange for a 37% interest in the company. Id. at 738. However, US Airways's financial condition continued to deteriorate in the wake of reduced passenger revenue and increased fuel costs and it determined that it could not meet the revenue targets upon which the ATSB and RSA loans were conditioned. Id.

As a result, US Airways again approached ALPA and asked for additional concessions

4

from the pilots. Among the concessions was modification of the DB Plan. Without conducting an independent audit to assess the financial health of the DB Plan, ALPA agreed to its modification in addition to other wage and benefit cuts. When confronted by its failure to conduct an audit, ALPA erroneously stated to its members that it could not compel the company to disclose the financial condition of the DB Plan. In fact, the collective bargaining agreement explicitly gave ALPA the right to conduct such an audit.

Unfortunately, this second round of concessions failed to solve the DB Plan's deficit, which, according to US Airways, was projected at $1.7 billion over the next seven years. Id. US Airways and ALPA pursued several potential solutions, including asking the IRS for a waiver of funding obligations and the Pension Benefit Guaranty Corporation for restoration funding. Id. at 738-39. After these efforts failed, US Airways and ALPA conducted confidential negotiations that produced an agreement in which US Airways agreed to negotiate and create a follow-up pension plan if the DB Plan had to be terminated. Id. at 739. The terms of this agreement were to remain confidential if and until the DB Plan was terminated, although ALPA members soon learned of the agreement, interpreting it as ALPA's tacit consent to the DB Plan's termination.

In January 2003, US Airways petitioned the bankruptcy court to "distress terminate" the DB Plan under ERISA. Over ALPA's objection, the bankruptcy court ruled that US Airways met the requirements for a distress termination, recognizing that the $1 billion loan guarantee from ATSB was dependent on resolution of the pension funding deficit. Id. at 744-46. Following the ruling, the two parties began negotiating the termination of the DB Plan and the creation of a follow-up plan. An actuary retained by ALPA to audit the plan verified US Airways' calculations concerning the plan's current and projected shortfall. During negotiations, several

ALPA members received letters from two union officials, assuring the pilots that they would have an opportunity to vote on any proposal to terminate the DB Plan and implement a new plan.[3] However, on March 22, 2003, without any vote, US Airways and ALPA agreed to replace the DB Plan with a new defined contribution plan ("DC Plan I").

Under the DC Plan I, US Airways was required to make contributions at different rates for each pilot based on a complex formula aimed at helping pilots achieve a target benefit amount upon retirement. The formula provided for greater contributions to pilots approaching the mandatory retirement age of 60 than to younger pilots who had more time to accrue contributions. However, the higher contributions to older pilots were still limited to 100% of the pilot's salary, meaning that regardless of the higher contributions, pilots close to 60 were less likely to meet the targeted retirement amount than younger pilots. Plaintiffs also allege that under the plan, older pilots would also receive a significant amount of their contributions subject to immediate taxation whereas younger pilots would be able to defer their tax obligations. In contrast to the DB Plan, US Airways was not required to guarantee a particular benefit level; rather, US Airways only had to make the promised contributions according to the formula.

Despite these cost-saving measures, US Airways filed for bankruptcy protection a second time under Chapter 11 on September 12, 2004. Subsequently, ALPA agreed to further concessions, including an amendment to the defined contribution plan ("DC Plan II") that eliminated the formula and targeted-benefit concept and instead required US Airways to make contributions to each pilot's individual account at the same rate – 10% of the pilot's salary –

---

[3] One of the letters, which were posted on ALPA's website, stated that "[t]he MEC is unanimous on one thing: membership ratification. In the end, you will make the call – not the judge, not your MEC - you."

6

regardless of age, seniority, or any other factor. At around the same time, some pilots – but not all – received a Summary Annual Report stating that the DB Plan had been fully funded as of December 31, 2002, directly contradicting the statements US Airways and ALPA had made at the time. Following the approval of a merger with America West Airlines, US Airways emerged from this second bankruptcy in September 2005.

Plaintiffs, all US Airways pilots over or approaching the mandatory retirement age of 60, brought suit in the Eastern District of New York in September 2003, alleging a breach of the duty of fair representation under the Railway Labor Act, 45 U.S.C. § 151, et seq., against ALPA and Duane Woerth,[4] former president of ALPA; violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., against ALPA and US Airways; violations of ERISA, 29 U.S.C. § 1001, et seq., against US Airways; and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., against ALPA, US Airways, and RSA. In November 2006, plaintiffs voluntarily withdrew all claims against US Airways. Thereafter, the remaining defendants moved to dismiss the Fourth Amended Complaint (hereinafter "complaint") and in a Memorandum and Order dated July 24, 2008, the district court dismissed all claims against all defendants.

On appeal, plaintiffs have not pursued their ADEA claims and have voluntarily dismissed their claims against RSA. Thus, the only claims remaining are plaintiffs' duty of fair representation and RICO claims against ALPA and Duane Woerth in his official capacity. As explained above, we only address plaintiffs' duty of fair representation claims – counts I through

_____

[4] Plaintiffs originally brought suit against other ALPA officials, but these claims were withdrawn.

III of the complaint – in this opinion.

## DISCUSSION

We review de novo a district court's decision to grant a motion for judgment on the pleadings pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Desiano v. Warner-Lambert & Co., 467 F.3d 85, 89 (2d Cir. 2006). To survive a motion to dismiss, a complaint must set out only enough facts to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quotation marks omitted).

Plaintiffs contend that the district court erred in dismissing their causes of action alleging that ALPA breached its duty of fair representation. A union "has a duty to represent fairly all employees subject to the collective bargaining agreement." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (citing Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 74 (1991)). Our review of such allegations is "highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." O'Neill, 499 U.S. at 78. To prove that a union has breached its duty of fair representation, the challenging members must establish two elements. First, they must prove that the union's actions or inactions "are either 'arbitrary, discriminatory, or in bad faith.' " Id. at 67. Second, the challenging members must "demonstrate a causal connection between the union's wrongful conduct and their injuries." Spellacy, 156 F.3d at 126; see also Sim v. New York Mailers' Union

8

No. 6, 166 F.3d 465, 472-73 (2d Cir. 1999).

A union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." O'Neill, 499 U.S. at 67 (citation and quotation marks omitted). Moreover, "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." Barr v. United Parcel Serv., Inc., 868 F.2d 36, 43 (2d Cir. 1989). A union's acts are discriminatory when "substantial evidence" indicates that it engaged in discrimination that was "intentional, severe, and unrelated to legitimate union objectives." Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge, 403 U.S. 274, 301 (1971). Bad faith, which "encompasses fraud, dishonesty, and other intentionally misleading conduct," requires proof that the union acted with "an improper intent, purpose, or motive." Spellacy, 156 F.3d at 126 (citations omitted).

Applying those standards here, we conclude that the district court did not err in dismissing counts I through III of the complaint. Count I alleges that ALPA's failure to conduct an audit, misrepresentation of its ability to do so, and later after-the-fact audit were a breach of the duty of fair representation. However, the allegations are only capable of supporting a finding that ALPA acted negligently. Since, even as alleged in the complaint, these events occurred against a particular "factual landscape" – after September 11, 2001, when US Airways "suffered further severe economic losses on top of prior financial difficulties," – we cannot conclude that ALPA's failure to conduct the audit was "so far outside a wide range of reasonableness as to be

9

irrational." O'Neill, 499 U.S. at 67 (internal citations and quotation marks omitted).[5]

Plaintiffs argue that ALPA acted in bad faith by agreeing to the termination of the DB Plan so that it could reap lucrative fees for managing the follow-up plan. As pled,[6] we do not believe that the allegations "nudge [plaintiffs' claim] across the line from conceivable to plausible." Iqbal, 129 S. Ct. at 1951 (quoting Twombly, 550 U.S. at 570). The complaint does not allege that the fees were of such proportion to the concessions so as to make it plausible that ALPA was improperly motivated by the fees when it agreed to the termination of the DB Plan. Plaintiffs have offered no plausible explanation for why ALPA would believe that such an arrangement would be in its self-interest. As for ALPA's alleged intentional misrepresentation of its right to conduct an audit, plaintiffs themselves allege that ALPA made the misrepresentation in an attempt to "legitimize ALPA's abdication of its responsibility," an allegation that supports a claim of negligence, not bad faith.

Contrary to plaintiffs' argument, the mere collection of management fees in exchange for services legally rendered does not, without more, evidence an improper motive. The cases that plaintiffs cite all involved illegal kickback schemes. See Conrad, Co. v. Jesco, Inc., No. 89-

---

[5] We do not adopt the district court's conclusion that dismissal was warranted because ALPA's decision not to audit the DB Plan prior to agreeing to its termination was a strategic decision that cannot be second guessed by the courts. First, it is difficult to discern exactly what "strategy" was involved in seeking less rather than more information. Second, there is a factual dispute as to whether this is in fact the reason that ALPA did not audit the DB Plan. See White v. White Rose Food, 237 F.3d 174, 178 n.2 (2d Cir. 2001) (assuming, without deciding, that a finding that a union's conduct violated its duty of fair representation involved a question of fact).

[6] Plaintiffs' allegations concerning the management fees are located in their RICO pleadings, not in their duty of fair representation pleadings. However, we assume that plaintiffs adequately pled this claim because we conclude that they have failed to state a claim in any event.

10

1726, 908 F.2d 966, 1990 Wl 101427, at *3 (4th Cir. July 12, 1990) (per curiam) (unpublished) (stating that "receiving of a kickback or a bribe" would indicate bad faith);  Peterson v. Offshore Div. of Int'l Org. of Masters, Mates & Pilots, No. 87-6374, 851 F.2d 360, 1988 WL 69763, at *1 (9th Cir. June 27, 1988) (unpublished) (holding that plaintiff had alleged fair representation claim on basis of allegations of "'kickbacks' in vacation pay").  Plaintiffs do not allege an illegal kickback scheme here.  Cf. 18 U.S.C. § 1954 (prohibiting payments intended to "influence operations" of employee benefit plan, but stating that the provision does not prohibit "payment to or acceptance by any person of bona fide salary . . . for services actually performed").

Moreover, plaintiffs have failed to allege a causal connection between ALPA's failure to conduct the audit and the termination of the DB Plan.  When ALPA finally did hire an actuary to conduct an audit, the actuary confirmed US Airways's numbers.  Thus, it is unclear how the audit would have increased ALPA's bargaining power or changed the result of the negotiations.  Plaintiffs argue that the later audit was insufficient because it "simply asked an actuary to use US Airways' same models (indeed, their same computer and numbers) to make sure those numbers added up correctly." Pls.' Rep. Br. 14.  Yet, Plaintiffs themselves state in their complaint that the DB Plan was only funded at 64% in 2002.  Thus, whether or not the later audit was sufficient, plaintiffs appear to agree with US Airways that the DB Plan was substantially underfunded.[7]

---

[7] On appeal, plaintiffs point to their allegations concerning the Summary Annual Report as support for their argument that there is a factual dispute regarding whether the DB Plan was actually underfunded in 2002.  The Summary Annual Report, which plaintiffs received in 2005, stated that the DB Plan was fully funded as of December 31, 2002.  However, in contrast to the Summary Annual Report, plaintiffs themselves do not allege that the plan was fully funded in 2002 and, indeed, allege the opposite – that it was underfunded at 64%.  Plaintiffs may not argue this both ways – they either believe that the DB Plan was underfunded or they believe it is an open question.  Given that all of the defendants in this case have assumed the truth of plaintiffs' allegations that the plan was only 64% funded in 2002, we assume, without explicitly finding,

11

Count II makes the same allegations as those in count I but further alleges that ALPA officials promised that termination of the DB Plan would be voted on by the membership, but notwithstanding this promise, no vote was held, and the plan was terminated. As to causation, this count alleged that "ALPA's rapid turnaround on the ratification issue prevented pilots from having any say as to the terms of the proposed DC Plan and thus disadvantaged certain ALPA members," and further that "[t]he promise of a ratification vote lulled the pilots into a false sense of security, with the result that they could do nothing but watch as their rights and their futures were traded away."

Assuming that the allegations in count II, if true, would constitute bad faith, plaintiffs have failed to plead a causal connection between this claim and their injuries. Plaintiffs have not alleged that, had a vote occurred, the pilots would not have voted for the DB Plan. Nor do they allege that rejecting the agreement would have resulted in a plan more generous to older pilots. It is true that if plaintiffs had been informed that no vote would take place, they might have lobbied hard to prevent termination of the DC Plan I. But even then, there is no allegation that the DB Plan could have been saved, given the bankruptcy court's ruling that US Airways qualified for distress termination.[8] In short, plaintiffs have failed to plausibly allege that ALPA's alleged bad

that the Summary Annual Report was in error.

[8] Plaintiffs argue that the district court erred in crediting the bankruptcy court's decision that US Airways qualified for distress termination of the DB Plan because if ALPA had conducted the audit, it would have discovered that the DB Plan was actually funded to 80% and distress termination would not have been inevitable. There are two problems with this argument. First, plaintiffs themselves allege in their complaint that the DB Plan was underfunded in 2002. Second, the bankruptcy court's decision was based on the anticipated future shortfall over the seven-year period covered by the company's plan for reorganization, not on its past or current funding levels. In Re US Airways Group, 296 B.R. at 745-46.

12

faith affected the outcome of the negotiations in any way.

Finally, in count III, plaintiffs allege that ALPA discriminated against them by agreeing to the terms of the DC Plans, which "impacted older pilots more harshly than younger pilots." Pl. Br. 36. As explained above, a union's acts are only discriminatory if they are "intentional, severe, and unrelated to legitimate union objectives." Lockridge, 403 U.S. at 301. Here, the DC Plan I actually benefitted older pilots by requiring US Airways to make larger contributions to older pilots' plans, which directly contradicts plaintiffs' theory that ALPA intended to discriminate against them. Similarly, the DC Plan II guaranteed older and younger pilots pension benefits based on the same formula – 10% of the pilot's salary. The fact that older pilots may have received fewer benefits under the plan is, as the district court explained in the context of plaintiffs' ADEA claims, "the result of basic economics, specifically the time value of money, and is not related to the older pilots' age."

Moreover, there is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives. See Ryan v. New York Newspaper Printing Pressmen's Union No. 2, 590 F.2d 451, 457 (2d Cir. 1979) ("The Union was trying to make the best out of a bad situation, and it was almost inevitable that the Union's drawing of a line would hurt someone. Although it is unfortunate that in this case the ultimate harm fell on appellants, drawing the line elsewhere would, or reasonably could have been thought would, have caused harm to others."); Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953) ("Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is

13

hardly to be expected."). Given that US Airways could not successfully reorganize and emerge from bankruptcy protection without decreasing its pension obligations, it was inevitable that the resulting negotiations would affect some pilots more harshly than others. Without additional evidence that the union intended to discriminate against plaintiffs, the mere fact that older pilots were disproportionally affected is not sufficient to show that ALPA acted in a discriminatory manner.

## CONCLUSION

Because we find the district court properly dismissed counts I, II, and III of plaintiffs' complaint, we affirm.