**In re PHILIP SERVICES CORPORATION, et al.**

No. 03–37718–H2–11.

United States Bankruptcy Court, S.D. Texas, Houston Division.

Feb. 3, 2004.

Anthony S. Coss, Struckmeyer & Wilson, Phoenix, AZ, Arthur H. Ruegger, Pryor Cashmon et al., Benjamin E. Wolff, III, Kwame N. Cain, Peter D. Wolfson, Robert J. Lanza, Sonnenschein Nath et al., New York, NY, Donald R. Wilson, Struckmeyer & Wilson, Phoenix, AZ, James Matthew Vaughn, Tony Loren Draper, Porter & Hedges, LLP, Houston, TX, John C. Childs, Monika Machen, Pia N. Thompson, Robert E. Richards, Sonnenschein Nath et al., Chicago, IL, John F. Higgins, IV, Porter & Hedges, Kevin M. Baucom, Galloway Johnson et al., Houston, TX, Marlys S. Palumbo, Van Ness Feldman PC, Seattle, WA, Paula A. Osborne, Butzel Long PC, Detroit, MI, Ronald W. Crouch, McGuire Woods LLP, Pittsburgh, PA, for Debtor.

Hector Duran, Office of US Trustee, Houston, TX, for U.S. Trustee.

Sandra Garrick, Israel Goldowitz, Nancy S. Heermans, James J. Keightley, Roger Reiersen, Washington, DC, for Pension Benefit Guaranty Corporation.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING DENIAL OF DEBTOR'S EXPEDITED MOTION TO APPROVE DISTRESS TERMINATION OF PENSION PLANS (doc # 1297), AND DENIAL OF DEBTOR'S EXPEDITED MOTION TO REJECT SINGLE EMPLOYER PENSION PLAN (doc # 1612)*

WESLEY W. STEEN, Bankruptcy Judge.

For reasons set forth below, and by separate written order issued December 10, 2003, the Court has denied the Debtor's expedited motion for approval of distress termination of four single employer pension plans ("Motion to Approve Distress Termination") (docket # 1297) and the Court has denied the Debtor's expedited motion to reject its single employer pension plans ("Motion to Reject Pension Plans") (docket # 1612).

### FACTS

*Preface*

As explained in more detail below, the cash flow exigencies of this case required expedited consideration of almost all issues, strained judicial resources, and resulted in an unusual chronology for the order and opinion in this matter. The Debtor alleged in motions filed November 18 and December 3 that a plan of reorganization could not be confirmed if the motion to terminate the pension plan and the motion to reject the pension plan were not granted. The Debtor also contended that all decisions as well as plan consummation had to be accomplished prior to December

31. At the hearing on December 8 (as announced on the record on December 10) the Court concluded that the necessary financial distress had not been proved and also ruled that rejection of a pension plan as an executory contract was not permissible. Nevertheless, and notwithstanding the Debtor's allegations, a plan was confirmed and consummated. These written reasons were delayed in part, by the Court's misunderstanding that settlement discussions were underway. The Court now understands that the Debtor needs these reasons in order to appeal. But rather than writing these findings and conclusions with the benefit of hindsight, the following findings and conclusions are made as if the plan had not yet been consummated, which was the situation when the Court made its decision. In other words, the following findings and conclusions are presented in the form that they were made on December 8, notwithstanding the fact that the plan has now been consummated.

*Findings of Fact*

The "Debtor" in this opinion includes a holding company and 43 wholly owned subsidiaries. Certain foreign subsidiaries, captive insurance-related entities, and inactive subsidiaries are not debtors.

There is no question that the Debtor has suffered financial distress. It was formed in 1991 and filed its first bankruptcy case in Delaware in 1999. Its first plan of reorganization became effective in 2000. The Debtor's consolidated revenues for 2002 were $1.1 billion and consolidate EBITDA for the year ended December 31, 2002 was $47.8 million. The Debtors net operating loss carryforward is about $365 million.

In this second bankruptcy case, the principal protagonists have been (i) holders of tranche A senior debt, (ii) holders of tranche B senior debt, (iii) unsecured creditors represented by the unsecured creditors committee, (iv) governmental environmental regulators, and (v) unions.

Hearings early in the case established that the Debtor needed immediate additional financing and that even with interim DIP financing the Debtor's cash flow could not support operations beyond December 31, 2003. Entities related to holders of senior debt offered DIP financing and offered to acquire the Debtor's businesses on an expedited schedule on terms set out in an Investment Agreement. Opposing entities (a coalition that changed constantly as negotiations in the case progressed) opposed the DIP proposal and objected to the Investment Agreement. After extended hearings and adjudications of a number of issues, the Court approved the DIP proposal and the Investment Agreement. A marketing effort was undertaken, the Investment Agreement was selected as the structure of the Debtor's proposed plan of reorganization, and the current plan was accepted by overwhelming vote of all classes of creditors.

The Debtor engaged in substantial asset sales and cost reductions both pre- and post-filing. All creditors (except the Tranch A Senior Debt) suffered at least a 90% loss. All collective bargaining agreements were terminated. Substantial compensation reductions were made. The capital stock was cancelled.

The Investment Agreement, incorporated into the plan, included a number of closing contingencies. The Purchaser was not obligated to close unless some 18 conditions (set forth in paragraph 5.1 of the Investment Agreement) were met, but the Purchaser had the right to waive any and all of those conditions. Among them was the requirement (subparagraph "p") that the Debtor must have rejected all single employer pension plans.

On November 18, 2003, the Debtor filed its Motion to Approve Distress Termination of the pension plans. On December 3, 2003, the Debtor filed its Motion to Reject Pension Plans.[1] The Court held a hearing on these motions on December 8, 2003. At that hearing, the Debtor introduced evidence which included undisputed information from other hearings and pleadings.

At the confirmation hearing and in the Disclosure Statement, the Debtor gave the following estimates of post-bankruptcy financial performance:

| (In thousands) | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Net Cash Provided by Operations | 71.1 | 55.3 | 46.9 | 54.2 |
| Capital Expenditures | 27 | 39.5 | 37 | 37 |
| Payment of Long Term Debt | 45 | 15.8 | 9.8 | 2.2 |

Although the Investment Agreement does not require the Debtor to pay its long term debt payment on the schedule that is included in this chart, the Debtor proposed to pay the debt at this rate because it expected to have the cash available and because the Debtor wanted to pay the debt down as quickly as possible. Testimony at the hearing on December 8, 2003 further indicated that at least some of the capital expenditures were discretionary.[2]

The PBGC looked at these figures and concluded that the Debtor had funds available for payment of the pension plan liability, the debt service, *and* the capital expenditures. The PBGC argued that part of the allocation for capital expenditures and part of the allocation for long term debt payment were available to service the pension plan obligation because the debt service repayment proposal was not mandatory and because the capital expenditures plan was not specific or mandated.

The parties agree that the pension plan liability is:[3]

| (In thousands) | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Total of all plans | 0.149 | 0.477 | 0.411 | 0.289 |

The Debtor argued that the Investment Agreement required termination of the pension obligation, that the termination of this obligation is a condition to closing, and that the Plan might not be consummated if the Court did not approve the termination. In support of that argument, the Debtor introduced into evidence the deposition of the Investor's representative, who testified that termination of the plans was "a material part of the plan" and that he thought that the Investor "would not go forward" if these plans were not terminated. In other parts of the deposition, however, the witness made it clear that he was not the decision maker and that he could not testify with certainty that the Investor would not waive that condition to closing. The PBGC argued, in response, that the statutory test is not whether an investor would rather pay the obligation or terminate it, but whether the obligation is such a substantial hardship and causes such distress

1. It is not clear why these motions were filed so late. The Investment Agreement (which contains the requirement) was signed in July. The PBGC believes that the delay was intentional to preclude a full and fair hearing. As matters turn out, the Court need not address this issue or speculate.

2. The Court recognizes that financial forecasting is complex, with multiple variables and assumptions, so that no single figure or assumption can be singled out and treated as independent. Thus, extension of debt repayment may change interest charges. Changes in capital expenditures may change productivity and revenue forecasts. But the pension plan liabilities are so small that they would not seem to cause material changes in the rest of the model. There was no evidence at the hearing that there would be any material effect.

3. *See* Exhibit 7.

that the Court should shift liability from the Debtor to a public corporation.[4]

The Court concluded, on the evidence presented, that the Debtor had not proved by a preponderance of the evidence that the plan would not be consummated if the Court did not grant the motions. From the beginning, the Debtor had offered its business for sale. There were competing offers. The Investment Agreement that was accepted was a negotiated arrangement. The Investor's offer increased substantially during the negotiations. The Investment Agreement required a number of cost reductions, most of which had been achieved. The Investment Agreement did not *require* achievement of *all* proposed cost reductions, it merely provided that the Investor was not obligated to close unless all are achieved; the Investor had the right to waive any condition to closing.

The testimony (that the Investor would not close if the motion(s) were not granted) was not persuasive, principally because it was self-serving, speculative, and hedged. The required payment is a small percentage of Net Cash Provided by Operations. Although the Debtor's projections proposed disposition of the entire Net Cash Provided by Operations, the evidence was vague and the intended use was discretionary. From 2004 through 2007, the pension obligation does not exceed 0.8% of Net Cash Provided by Operations. The Court concluded that payment of these pension obligations did not make the plan impossible, it merely makes the cost slightly higher to the Investor. In short, the Court concluded that this $1.326 million obligation over 4 years was not a straw that would break the camel's back.

---

**4.** The PBGC is a public corporation that guarantees, within certain limits, pensions promised under defined benefit pension plans covered by Title IV of ERISA. When a plan is terminated but has insufficient funds to pay

CONCLUSIONS OF LAW

*Distress Termination of Single Employer Pension Plans (docket # 1297)*

■ The parties agree that Section 1341(c)(2) of the Employee Retirement Income Security Act of 1974, as amended, governs distress termination of single employer pension plans in the context presented at this time.

29 U.S.C. § 1341 provides, in pertinent part, as follows:

(a) ... a single-employer plan may be terminated *only in a standard termination* under subsection (b) of this section *or a distress termination* under subsection (c) of this section ...

(c) Distress termination of single-employer plans

(1) In general

A single-employer plan may terminate under a distress termination *only if* ...

(C) the [PBGC] determines that the requirements of subparagraph (B) of paragraph (2) are met ...

(2) Termination requirements

(B) Determination by the [PBGC] of necessary distress criteria

... the [PBGC] shall determine whether the requirements of this subparagraph are met as provided in clause (i), (ii), or (iii) ...

(ii) Reorganization in bankruptcy or insolvency proceedings The requirements of this clause are met by a person if—

(I) such person has filed, or has had filed against such person, as of the

---

the guaranteed benefits, the guaranteed benefits are paid by a combination of plan funds and PBGC funds. The source of PBGC funds is a fee imposed by the law on all covered defined benefit pension plans.

proposed termination date, a petition seeking reorganization in a case under Title 11 or under any similar law of a State or political subdivision of a State (or a case described in clause (i) filed by or against such person has been converted, as of such date, to such a case in which reorganization is sought),

**(II)** such case has not, as of the proposed termination date, been dismissed,

**(III)** such person timely submits to the corporation any request for the approval of the bankruptcy court (or other appropriate court in a case under such similar law of a State or political subdivision) of the plan termination, and

**(IV)** the bankruptcy court (or such other appropriate court) determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination. [Emphasis Supplied.]

In summary, the plain language of the statute provides that:

1. There are *only* two methods for termination of a single employer pension plan: a standard termination and a distress termination.

2. A single-employer pension plan may terminate under a distress termination *only* if the PBGC makes certain determinations. Those determinations include a determination that the requisite distress criteria are present.

3. The PBGC *shall* find that the "necessary distress criteria" are met if

   a. The applicable entities have a pending reorganization proceeding,

   b. The applicable entities submits a request for bankruptcy court approval of plan termination, and

   c. The bankruptcy court determines that without termination the entities will be unable to pay all their debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

The memorandum filed by the PBGC argues at some length about its exclusive authority to determine distress termination, and implies that the bankruptcy court's role in this statutory scheme is in the nature of a fact-finder for the PBGC. The Debtor's memorandum argues that reading the statute this way creates tension (or actual conflict) between ERISA's objectives and those of the Bankruptcy Code. Presumably, judicial review would be appropriate if the PBGC failed to make the statutorily mandated determination based on the bankruptcy court's determination, although the appropriate court of review might be debatable. Happily, those issues need not be addressed in this case because the Court does not make the finding that the Debtor is unable to pay its debts pursuant to a plan if the pension plan is not terminated.

The Debtor argued at some length that the Investor would not close the transaction under the Investment Agreement, that only one plan was in prospect, and therefore no plan would be consummated if the motion(s) were not granted. Therefore, the Debtor argued, termination/rejection were necessary so that the Debtor could pay its debts under a plan. The Debtor cites *In re U.S. Airways Group, Inc.* 296 B.R. 734 (Bankr.E.D.Va.2003), *In re Wire Rope Corp. of America, Inc.,* 287 B.R. 771 (Bankr.W.D.Mo.2002), and *In the*

*Matter of Sewell Manufacturing Company, Inc.* 195 B.R. 180 (Bankr.N.D.Ga.1996).

In *US Airways* Judge Mitchell went to great pains to explain the overwhelming evidence that the debtor could not survive without termination of the pension plan. The financial reality in that case is undeniable. But of particular relevance here, Judge Mitchell explained that the bankruptcy court should not look to the specific plan being proposed, but should consider all of the facts and circumstances.

> The reference in the statute to "a" plan of reorganization does not permit a distress termination simply because a particular plan requires it; rather the test is whether the debtor can obtain confirmation of *any* plan of reorganization without termination of the retirement plan. *US Airways* at 743.

The decision in *Wire Rope* was easier for two reasons. First, the motion for termination of the pension plan was *unopposed*, even by the PBGC. Second, the Debtor's pension obligation in that case was greater than its projected (uncontradicted) "free cash flow"; the Debtor would not have enough money to pay the pension obligation even if it paid no debt. And although the PBGC contested the procedure of distress termination in *Sewell*,[5] it apparently did not present evidence and did not contest the contention that the debtor could not earn enough money to pay the pension obligation. Both of these courts concluded that the debtors simply would not have enough cash to pay the pension obligation. That makes a distress termination decision different from the case at bar, and considerably easier.

■ The essence of the Debtor's argument in the instant case was that the pension plans must be terminated because the Investor said that they must be terminated: *ipse dixit.* Accepting *that* argument would be tantamount to allowing the Investor to make the decision reserved to the bankruptcy court under ERISA. This Court concludes that in determining whether a pension plan must be terminated as a distress termination, the bankruptcy judge should consider the provisions of a proposed chapter 11 plan (if one has been proposed at the time of the decision) but that the bankruptcy judge must also look to existential financial reality and try to judge whether the plan provisions are necessary or whether they are merely desired by the entities that would benefit from the termination. In this case, the Court concludes that the pension terminations were not necessary even though they were desired by the Investor.

The Debtor also argued that even if the plans were not terminated in a distress termination, nevertheless the Debtor should be allowed to reject them as executory contracts. In support of that argument, the Debtor cites legislative history suggesting that the amendment of ERISA (enacting the distress termination provisions) intended to leave to the courts a determination of whether a pension plan was an executory contract.

■ The Court concludes that rejection of a pension plan as an executory contract is not permissible if the requirements of distress termination are not met. First, notwithstanding the legislative history, ERISA provides a considered and comprehensive set of rules and procedures to deal with the problem of underfunded single-employer pension plans. The statute was enacted to overrule jurisprudence that Congress viewed as inappropriate, and the language of the statute states that it is

---

5. The PBGC argued in *Sewell* that the bankruptcy court could not make a distress termi-nation determination until a plan had been proposed. That issue does not arise here.

exclusive. The statute starts with the statement that the ERISA termination provisions are the "Exclusive means of plan termination ..." [6] "Exclusive" means "exclusive" ... there are no other means. The statute also states: " ... a single-employer plan may be *terminated only* in a standard termination ... or a distress termination under ... this section." [7] [Emphasis supplied.] The words "only" occur in uncommon frequence in this statute. If one interprets the clear words of the statute instead of the vague legislative history, the answer seems clear.

The Court of Appeals for the Fifth Circuit reinforces this analysis. In *In the Matter of Esco Manufacturing Co.*, 33 F.3d 509 (5th Cir.1994) ("*Esco I*") the Fifth Circuit rejected the argument that the exclusivity of the ERISA termination provisions offend the Bankruptcy Code. If that decision had not been withdrawn by *In the Matter of Esco Manufacturing Co.*, 50 F.3d 315 (5th Cir.1995) *("Esco II"),* the task at hand would be much simpler. In *Esco II*, the Fifth Circuit found that its initial frame of analysis was not correct, but it is not clear that the Fifth Circuit intended to withdraw its conclusion that there is no conflict between ERISA and the Bankruptcy Code. In fact, *Esco II* reiterates the conclusion that ERISA is the exclusive means of terminating a pension plan.

Therefore, the Court concludes that a Debtor may not "reject" a pension plan as an executory contract. The specific ("exclusive") statute trumps the vague ("general") statute when there is no demonstrated conflict.

A very difficult question, however, was not argued, tried, or briefed. A pension plan, as defined in ERISA, is a combination of a trust and an employer's obligation to contribute to the trust for the benefit of employees. "Termination" of the plan has consequences, defined by ERISA, including consequences related to determination of vesting of employee benefits (and allocation of the funds available in the trust to pay those benefits) and with respect to the employer's obligation to contribute to the trust. While the parties in this case agreed on the actuary's estimate of the Debtor's pension obligation, the parties have not agreed on whether this obligation is a priority claim or an unsecured claim without priority. The amount and classification of the PBGC claim against the estate, debtor, Purchaser, or any other party is not decided by this opinion.